Slip Op. 06-13

# UNITED STATES COURT OF INTERNATIONAL TRADE

GUANGDONG CHEMICALS
IMPORT & EXPORT CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Restani, Chief Judge

Court No. 05-00023

## OPINION

[Results of Department of Commerce Periodic Review on Antidumping Duty Order on Sebacic Acid from the People's Republic of China Remanded.]

Dated: January 25, 2006

Garvey Schubert Barer (Ronald M. Wisla and William E. Perry) for the plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand), Arthur D. Sidney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for the defendant.

Restani, Chief Judge: Guangdong Chemicals Import and Export Corporation ("Guangdong") appeals from a ruling by the Department of Commerce ("Commerce" or "the Department") conducting an administrative review of an antidumping duty order entered against sebacic acid from the People's Republic of China ("China"). See Sebacic Acid from the People's Republic of China, 69 Fed. Reg. 75,303 (Dep't Commerce Dec. 16, 2004) (final results of antidumping admin. review). Guangdong alleges that the review should be dismissed for lack of

service or remanded for lack of substantial evidence supporting Commerce's calculation of the surrogate value of the input factor sebacic acid and failure to properly credit by-product offsets.

Commerce's failure to properly serve Guangdong was harmless error, but the determination is remanded as to the surrogate value for sebacic acid and by-product credit.

## BACKGROUND

The facts of this case may neatly be divided into two parts. The first set of relevant facts relate to the circumstances surrounding Genesis Chemical Corp.'s ("Genesis") failure to serve Guangdong. On July 2, 2003, Commerce published notice of an opportunity to request review of an antidumping duty order entered against exporters of sebacic acid from China. Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 68 Fed. Reg. 39,511 (Dep't Commerce July 2, 2003) (opportunity to request administrative review). On July 21, 2003, Genesis submitted a request that Commerce perform an administrative review of sebacic acid from two specific companies, Tianjin Chemical Import and Export Co. and Guangdong. See Letter from Greg E. Mitchell, Frost Brown LLC, to the Assistant Sec'y for Imp. Admin, Int'l Trade Admin. (Jul. 21, 2003), P.R. Doc. 2, Pl.'s App. Tab 2. In mid-July, counsel for Genesis contacted an employee of the Department of Commerce to inquire whether the firm was required to serve its client's request for administrative review on parties on the public service list. See Memorandum from Michael Strollo, Senior Analyst, Dep't of Commerce to Louis Apple, Office Director, Dep't of Commerce (Aug. 22, 2003), P.R. Doc. 6, Pl.'s App. Tab 4, at 1 [hereinafter Service Mem.]. A Commerce employee stated that no service was necessary because no public service list had yet been generated. Id. Counsel for Guangdong received an antidumping review questionnaire on August 14, 2003, which was its first

notice of the review. See Letter from Ronald M. Wisla, Garvey Schubert Barer, to Donald Evans, Sec'y of Dep't of Commerce (Aug. 20, 2003), P.R. Doc. 4, Pl.'s App. Tab 3, at 1–2. On August 20, Guangdong sent Commerce a letter requesting that Commerce decline review because it had not been properly served. Id.

Commerce published a notice of initiation on August 22, 2003. Initiation of Antidumping and Countervailing Duty Reviews and Request for Revocation in Part, 68 Fed. Reg. 50,750 (Dep't Commerce Aug. 22, 2003). That day, it also entered a memorandum into its files recognizing that Genesis had failed to serve Guangdong within the regulatory time-frame established by 19 C.F.R. § 351.303(f)(3)(ii) (2005). See Service Mem., Pl.'s App. Tab 4. The memorandum stated that Genesis would be allowed to cure its deficient service by serving the request on or before August 29, 2003. Id., Pl.'s App. Tab 4, at 1–2. Genesis served Guangdong on August 26. Letter from Greg E. Mitchell, Frost Brown Todd LLC, to Assistant Sec'y for Imp. Admin, Int'l Trade Admin. (Aug. 26, 2003), P.R. Doc. 9, Def.'s App. Tab 1.

The second set of facts relate to Commerce's method of calculating a surrogate value for sebacic acid. Guangdong purchases its sebacic acid from a producer named Hengshui Dongfeng Chemical Co. Ltd. ("Hengshui"). See Sections C and D Response of Guangdong Chems. Imp. & Exp. Corp. Group (Nov. 4, 2003), P.R. Doc. 21, Pl.'s App. Tab 13, at D-1. Sebacic acid production results in the creation of a co-product, capryl alcohol. Prelim. Valuation of Factors of Prod., Memorandum from Greg Kalbaugh, Dep't of Commerce, to File (Jul. 30, 2004), P.R. Doc. 47, Pl.'s App. Tab 6, at 4 [hereinafter Prelim. Valuation of Factors of Prod. Mem.]. In order to calculate Hengshui's production costs for sebacic acid, Commerce allocated production costs between the two products based on their relative sales values in India. Id., Pl.'s App. Tab 6, at 4. Because India does

not produce sebacic acid, Commerce relied on import statistics to estimate the value of sebacic acid in India. Id., Pl.'s App. Tab 6, at 1–2. Commerce used statistics from the Indian Department of Commerce's Import/Export Data Bank (the "Indian government statistics"), which lumped sebacic with azelaic acid (a common derivative of sebacic acid) under Indian Harmonized Tariff Schedule ("HTS") subheading 291713. Id., Pl.'s App. Tab 6, at Attach. 4. Guangdong proposed using surrogate value data for sebacic acid maintained by the Indian publication Chemical Weekly (the "Chemical Weekly data"), which was based on a selection of the Indian government data, but was further subdivided and included a specific subheading for sebacic acid (291713.02). Guangdong Chems. Imp. & Exp. Co. Case Br. (Sept. 20, 2004), P.R. Doc. 65, Pl.'s App. Tab 8, at 2–3 [hereinafter Guangdong Case Br.]. Based on this data, Guangdong argued that the value of sebacic acid in India during the Period of Review ("POR") was $3,551.73 per metric ton. Id., Pl.'s App. Tab 8, at 7. Guangdong corroborated its proposed value with data from U.S. import statistics for sebacic acid, published Indian prices for oxalic acid (asserted to be similar to sebacic acid), and benchmark price data from the publication Chemical Market Reporter. Id., Pl.'s App. Tab 8, at 6–7.

Commerce refused to use the Chemical Weekly data, stating that its authenticity could not be verified, and that the data, which relied on two shipments totaling 1,400 kilograms, did not "represent a sufficiently broad range of import values on which to base the surrogate value for sebacic acid." See Issues & Decision Mem. for the Antidumping Duty Admin. Review of Sebacic Acid from the People's Republic of China (Dec. 10, 2004), P.R. Doc. 80, Pl.'s App. Tab 10, at 7 [hereinafter Issues & Decision Mem.]. Recognizing that HTS 291713 was a basket category including both sebacic and azelaic acid, Commerce conducted additional research to determine

whether prices for azelaic acid and sebacic acid were similar.  See Comparison of U.S. Int'l Trade Comm'n Dataweb Values for Sebacic Acid & Azelaic Acid Imps. to the U. S., Memorandum from Jennifer Moats, Dep't of Commerce, to File (Dec. 10, 2004), P.R. Doc. 79, Pl.'s App. Tab 11, at 1 [hereinafter Price Comparison Mem.].  It concluded that the two products were similarly priced, varying only by $0.30 per kilogram over a twenty-three month period during which the price for sebacic acid ranged between $2 and $3 per kilogram.  Id., Pl.'s App. Tab 11, at 1.  Commerce therefore used the basket category Indian government statistics to determine the surrogate value of sebacic acid, calculating the surrogate value of sebacic acid in India to be $15,826.30 per metric ton. See Issues & Decision Mem., Pl.'s App. Tab 10, at 9 (electing to use Indian government statistics); see also Prelim. Valuation of Factors of Prod. Mem., Pl.'s App. Tab 6, at 4 (using Indian government statistics to arrive at $15,826.30 per-metric-ton value for sebacic acid).

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to review Commerce's administration of an antidumping review under 28 U.S.C. § 1581(c) (2000).  The Court will uphold an administrative decision unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000).

## DISCUSSION

### I.      Failure To Serve Notice

#### A.      Genesis Did Not Make A Reasonable Attempt to Serve Guangdong Under 19 C.F.R. § 351.303(f)(3)(ii).

A petitioner requesting an administrative review of an antidumping order "must serve

a copy of the request by personal service or first class mail on each exporter or producer specified in the request . . . by the end of the anniversary month or within ten days of filing the request for review, whichever is later." 19 C.F.R. § 351.303(f)(3)(ii). A petitioner has the responsibility to serve a specified exporter whether or not that exporter appears on Commerce's service list; however, if the interested party is "unable to locate a particular exporter or producer . . . the Secretary may accept the request for review if the Secretary is satisfied that the party made a reasonable attempt to serve a copy of the request on such person." Id.

A Commerce employee advised Genesis that no service was necessary at the time it filed its petition for review because no public service list had yet been generated. Genesis understood this advice to mean that it did not have to serve Guangdong with notice of its request for review despite its obligations under 19 C.F.R. § 351.303(f)(3)(ii). Although the petitioners "misconstrued" Commerce's instruction, Commerce granted Genesis additional time in which to "remedy the procedural deficiency." Service Mem., Pl.'s App. Tab 4, at 1. This was done by letter thirty-six days after Genesis's initial request and four days after the initiation of review.

Genesis's call to Commerce cannot be considered a "reasonable attempt." Reliance on faulty agency advice, or a misinterpretation of agency advice, does not excuse a party from failing to comply with the law. See Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384–85 (1947) ("[E]veryone is charged with knowledge of the United States Statutes at Large, [and] Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."); Cathedral Candle Co. v. U.S. Int'l Trade Comm'n., 285 F. Supp. 2d 1371, 1378 n.10 (CIT 2003) ("It is well established by both statutes and cases that the publication of an item in

the Federal Register constitutes constructive notice of anything within that item."). To say that Genesis's inquiry with Commerce by itself constituted a reasonable attempt at service would imply that Genesis is not charged with knowledge of Commerce's regulations. It is undisputed that Genesis was aware of, and provided Commerce with, Guangdong's location and that Genesis was not prevented in any way from serving Guangdong. Failure to serve cannot be excused by Genesis's failure to read the relevant regulation.

This court has suggested that a party may make a "reasonable attempt" at service by "curing" faulty service after discovering the defect. See PAM, S.P.A. v. United States, 395 F. Supp. 2d 1337, 1342–43 (CIT 2005). In that case, the court voided an administrative review for failure to comply with the service requirements of 19 C.F.R. § 351.303(f)(3)(ii). Id. at 1344. It distinguished another opinion, NSK, Ltd. v. United States, 346 F. Supp. 2d 1312, 1325 (CIT 2004), that refused to void an administrative review for failure to comply with the same regulatory provision. PAM, 395 F. Supp. 2d at 1343 n.2. In NSK, the petitioner failed to serve notice on a respondent under § 351.303(f)(3)(ii) until after the notice of initiation was published in the Federal Register. 346 F. Supp. 2d at 1323–24. Upon discovering its mistake, the petitioner faxed notice to the respondent. Id. at 1324. The court in PAM argued that a reasonable attempt at service had been made in NSK because "upon discovery of lack of service, petitioner attempted to cure its defective service by facsimile service." PAM, 395 F. Supp. 2d at 1343 n.2. Assuming that a party may attempt service by "curing" their default after the time for service has passed, Genesis's service would still not constitute a "reasonable attempt." In NSK, the petitioner, apparently of its own accord, realized its own mistake the day after initiation and immediately sought to serve the respondent. See Decision

Mem., A-100-001 at 94 (Aug. 3, 2002) (ball bearings and parts thereof), available at

http://ia.ita.doc.gov/frn/summary/2002aug.htm.  In this case, Commerce published its notice of

initiation while instructing Genesis to cure its mistake.[1]  Only after Commerce's prompting did

Genesis attempt to "cure" this error.

### B.      Commerce's Obligation to Abide By Its Own Regulations

Commerce asserts that it was within its discretion to relax its procedural rules

regarding service in the interests of justice.  No statute requires a petitioner to serve a respondent

when it requests an administrative review.  Nevertheless, in enforcing the antidumping laws,

Commerce has created a regulation obligating a party requesting a review to serve a proposed

respondent with notice.  Having exercised its discretion to create such a requirement, Commerce is

generally required to play by its own rules. United States ex rel. Accardi v. Shaughnessy, 347 U.S.

260, 268 (1954); Vitarelli v. Seaton, 359 U.S. 535, 547 (1959) (Frankfurter, J., concurring in part

and dissenting in part) (recognizing a "judicially evolved rule of administrative law" that "he who

takes the procedural sword shall perish with that sword").

The Supreme Court has not held, however, that the courts are required to reverse

subsequent agency action on the basis of any procedural misstep, no matter how minute or

inconsequential.  Thus, judicial review of agency action is conducted with "due account . . . of the

---

[1]  The court also notes that the terms of the regulation require a reasonable attempt at service to take place before the Secretary accepts a petition for administrative review. See 19 C.F.R. § 351.303(f)(3)(ii) (allowing Secretary to accept review "if . . . satisfied that the party made a reasonable attempt to serve a copy of the request on such person") (emphasis added). The regulation nowhere provides for the Secretary to accept a petition conditioned on a future attempt to serve.

rule of prejudicial error." 5 U.S.C. § 706 (2000).[2] If, as is often the case, no law or regulation specifies the consequence of non-compliance with a regulation, the court must determine what remedy, if any, should be imposed. In this endeavor, the court is guided by the Supreme Court's opinion in American Farm Lines v. Black Ball Freight Service, 397 U.S. 532 (1970). First, it must be determined whether the regulation in question was "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" or if the "agency [was] required by rule to exercise independent discretion [but] has failed to do so." Id. at 538–39; see also Lopez v. Fed. Aviation Admin., 318 F.3d 242, 247 (D.C. Cir. 2003). If the regulation was not so intended, but, for example, was intended to ease the agency's administrative burden, the court considers whether the party challenging agency action has shown that it was substantially prejudiced by the agency's failure to comply with its rules. See Lopez, 318 F.3d at 247. If substantial prejudice is shown, the administrative action is reversed, if not, it is affirmed. See Dixon Ticonderoga Co. v. U.S. Customs & Border Prot., 366 F. Supp. 2d 1352, 1357 (CIT 2005).

If the violated regulation was intended to confer important procedural benefits, the result is less clear. Some courts applying the American Farm Lines test have automatically reversed agency action. See Port of Jacksonville Maritime Ad Hoc Comm., Inc. v. U.S. Coast Guard, 788 F.2d 705, 708 (11th Cir. 1986); Alamo Express, Inc. v. United States, 613 F.2d 96, 97–98 (5th Cir. 1980).

---

[2] 19 U.S.C. § 1677c(b) (2000) provides that administrative hearings in antidumping duty reviews are "not subject to the provisions of subchapter II of chapter 5 of title 5, or to section 702 of such title" of the Administrative Procedures Act ("APA"). These provisions do not apply to 5 U.S.C. § 706, which is located in chapter 7 of the APA.

In contrast, the District of Columbia Circuit has found that harmless error should be considered in the context of a regulation providing important procedural safeguards to an employee facing termination by the Federal Aviation Administration ("FAA"). Lopez, 318 F.3d at 248. In Lopez, the court specifically found that

> the FAA's procedures challenged by Lopez are not primarily intended to provide information to the agency, but are instead aimed at protecting the [employee] from the Administrator's otherwise unlimited discretion. It is uncontested that FAA Orders 8110.37C and 8130.24 provide procedural safeguards that are the only available protection for [employees] whose designation can otherwise be terminated by the FAA for "any reason considered appropriate by the Administrator."

Id. at 247–48 (quoting 49 U.S.C. § 44702(d)(2)). Despite finding that the rules provided procedural benefits for employees, the court nonetheless refused to reverse the FAA's employment decision because Lopez did not show he was "pressed for time in responding to the FAA's view of his performance or that other defenses would have been presented with additional time." Id. at 248. He therefore "fail[ed] to show that the FAA's initial oversight was other than harmless." Id.

Other courts have dispensed with the inquiry of whether a regulation provides important procedural benefits and have gone straight to the question of prejudice. For example, the court of Appeals for the Ninth Circuit held in the context of a deportation proceeding that a "[v]iolation of a regulation renders a deportation unlawful only if the violation prejudiced interests of the alien which were protected by the regulation." United States v. Calderon-Medina, 591 F.2d 529, 531 (9th Cir. 1979).

More recently, the Second Circuit refused to require proof of prejudice in all cases, but found that agency action will be voided automatically for failure to follow its regulations only if it affects "fundamental rights derived from the Constitution or a federal statute." Waldron v. INS,

17 F.3d 511, 518 (2d Cir. 1994). In Waldron, the court considered two INS regulations, 8 C.F.R. § 242.2(g) (1994), which required an alien to be notified of his right to contact a consular official when taken into custody, and 8 C.F.R. § 3.7, which provided that an Immigration Judge's decision must include a certificate of notice if its opinion must be certified to the Board of Immigration Appeals, if known at the time the opinion was filed. Id. at 515–16. The court held that

> we believe that, when there is a regulation which relates to less fundamental, agency-created rights and privileges, the wholesale remand of cases, where no prejudice has been shown to result from the INS's failure to strictly adhere to its regulations, would place an unwarranted and potentially unworkable burden on the agency's adjudication of immigration cases.

Id. at 518; see also Chong v. INS, 264 F.3d 378, 390 (3d Cir. 2001) (following Waldron).[3]

No case from the Federal Circuit applies the American Farm Lines test in the context of a regulation intended to confer important procedural benefits, and it is not clear which approach the appellate court would adopt. Kemira Fibres Oy v. United States, 61 F.3d 866 (Fed. Cir. 1995), applied the American Farm Lines substantial prejudice test to a Commerce regulation requiring publication of any "notice of intent to revoke [an antidumping duty] order" no later than five anniversary-months after receiving its last request for administrative review. Id. at 869 (citing 19 C.F.R. § 353.25(d) (1995)). The court was careful to note that the regulation in question was a "merely procedural aid[]" to accomplishing the goal of the antidumping laws to provide "notification of domestic parties so that their interest in revocation of an outstanding order may be ascertained and addressed." Id. at 875. Because the regulation was "merely procedural" the court required the

_____

[3] The Fourth Circuit has reserved the question of when prejudice is presumed after an agency fails to comply with its own regulations in the context of a regulation governing representation of prisoners during a hearing to determine whether medication should be involuntarily administered. United States v. Morgan, 193 F.3d 252, 267 (4th Cir. 1999).

plaintiff to "establish that it was prejudiced by Commerce's non-compliance with this requirement." Id.

Other cases from the Federal Circuit have dispensed with the inquiry into whether a regulation is "merely procedural" and held that "[i]t is well settled that principles of harmless error apply to the review of agency proceedings." Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996). In that case, the Customs Service ("Customs") published regulations requiring a district director, prior to extending the liquidation period for entered goods, promptly to notify an importer and its surety "on Customs Form 4333–A . . . that the time has been extended and the reasons for doing so." Id. at 393 (quoting 19 C.F.R. § 159.12(b) (1996)). In Intercargo, Customs sent a notice to sureties that did not state which of the statutorily authorized reasons for the extension was relied on, and thus "did not satisfy the requirement of the regulation." Id. at 394. Applying principles of harmless error, the court first found that neither the regulation, nor the governing statute, provided a consequence for the failure to send proper notice under § 159.12(b). Id. at 394–96. The court then determined that the regulation was "amenable to harmless error analysis," noting that "a plaintiff 'should not become immune from the antidumping laws because Commerce missed the deadline.'" Id. at 396 (quoting Kemira Fibres Oy, 61 F.3d at 873). The court concluded that "[t]he public interest in the administration of the importation laws should not 'fall victim' to the failure by the Customs Service to use the requisite language in its extension notices, if the oversight has not had any prejudicial impact on the plaintiff." Id. at 396 (quoting Kemira Fibres Oy, 61 F.3d at 873).

Likewise, in Belton Industries, Inc. v. United States, 6 F.3d 756, 761 (Fed. Cir. 1993),

the court of appeals found that Commerce "violated 19 C.F.R. § 355.25(d)(4)(ii)" by failing to "send written notice to the appellees . . . despite its prior recognition of them as interested parties." Commerce had instead sent written notice of initiation of a sunset review to the appellees' counsel and a trade association of which the appellees were members. The court declined to void the subsequent agency action, noting that "appellees suffered no prejudice" and that appellees' counsel received actual notice of the proposed action. Id. The court ruled that the failure to abide by Commerce's own regulations was "harmless error." Id.

Although Kemira Fibres Oy, Intercargo and Belton all upheld agency action, the three cases can be read as standing for different propositions. On one hand, Kemira implies (but is not premised on) the stricter approach of the Fifth and Eleventh Circuits, presuming prejudice when an agency fails to follow its regulations that are intended to confer a procedural benefit. On the other hand, Intercargo and Belton can be seen as similar to the approach of the Ninth and Second Circuits, which do not presume prejudice in all cases where an agency fails to abide by its regulations that are intended to confer procedural benefits. See Atteberry v. United States, Slip Op. 03-93, 2003 WL 21748674, at *11 n.40 (CIT Jul. 28, 2003) ("Intercargo – and cases that have followed it, such as [Cummins Engine Co. v. United States, 23 CIT 1019, 1032, 83 F. Supp. 2d 1366, 1378 (1999)] – can be read to extend Accardi and its progeny by requiring 'harmless error' analysis in every case involving an agency's violation of its statute or regulations, without regard to the nature and extent of the remedy sought by the complainant.") (citation omitted).

Additionally, this court has grappled with Commerce's failure to abide by this very regulation in two recent opinions. In NSK, the court stated that a nine-day delay in notice resulting

from a petitioner's failure to properly serve respondent did not invalidate review because "the regulation here was 'not intended to confer important procedural benefits'" and the plaintiff could not demonstrate substantial prejudice. 346 F. Supp. 2d at 1325 (quoting Taiyuan Heavy Mach. Imp. & Exp. Corp. v. United States, 23 CIT 701, 703 (1999). The court found that "nine fewer days of preparation time, prior even to receipt of Commerce's questionnaire, does not constitute such substantial prejudice that a remand is required on this issue." Id. at 1326.

In another case, this court found that 19 C.F.R. § 351.303(f)(3)(ii) "does indeed confer important procedural benefits upon the individual companies involved in normal antidumping administrative reviews." PAM, 395 F. Supp. 2d at 1343.[4] In that case, Commerce allowed a review to proceed although no service occurred before or after the regulatory deadline had passed, unlike NSK, where the respondent was eventually served. Id. The court in PAM voided the administrative review for failure to comply with the regulation's requirements. Id. at 1344.

The court believes that the best way to reconcile cases such as Kemira with Belton and Intercargo is to apply the following process. First, the court will consider whether the regulation (or statute it implements) spells out a remedy for failure to comply. Second, if no remedy is stated, the court will consider whether the regulation in question was intended to provide important procedural benefits. Third, if the regulation is not intended to provide important procedural benefits, Commerce's action will be voided only if the plaintiff can show it in fact suffered substantial

---

[4] As noted above, the PAM court distinguished NSK on the grounds that Commerce "cured" the defect once it was discovered, leading to a "reasonable attempt" at service within the terms of the regulation. PAM, 395 F. Supp. 2d at 1343 n.2. NSK's discussion of American Farm Lines was therefore treated as dicta.

prejudice.[5]  If the regulation is intended to provide important procedural benefits, the court will void

the agency action unless the agency demonstrates that the violation was harmless error.  Cf. Wilson

v. Comm'r Soc. Sec., 378 F.3d 541, 547 (6th Cir. 2004) (stating in dicta that an agency's failure to

follow a regulation "creating an important procedural safeguard for claimants for disability benefits"

might nonetheless "constitute harmless error").

This approach has the virtue of recognizing Commerce's responsibility to comply

with its regulations, especially regulations intended to benefit participants in the administrative

process, while avoiding a rigid rule that would mandate reversal based on a court's construction of

regulatory intent alone, with little or no reference to the facts of a particular case.[6]  This rule also

allows the court to follow the American Farm Lines test, as applied in cases such as Kemira, while

heeding the language of the APA, which requires that "due account shall be taken of the rule of

prejudicial error."  5 U.S.C. § 706.  Applying this test, the court finds that even if it is assumed that

§ 351.303(f)(3)(ii) was intended to provide an important procedural benefit, failure to provide

service until after commencement of the review process in this case constituted only harmless error.

The regulation in question here, 19 C.F.R. § 351.303(f)(3)(ii), does not state

consequences for failure to comply.  See NSK, 346 F. Supp. 2d at 1325.  The regulation is intended

---

[5]  See, e.g., Dixon Ticonderoga, 366 F. Supp. 2d at 1357 (CIT 2005) (voiding agency action for failure to comply with 19 C.F.R. § 159.62(a) (2003), which requires a notice of intent to distribute funds obtained pursuant to antidumping duty orders under the "Byrd Amendment," 19 U.S.C. § 1675c (2000), despite finding that the regulation in question was "merely [a] procedural aid[]," because plaintiffs failed to show substantial prejudice).

[6]  The court needs not decide here how "substantial prejudice" differs from "harmless error."  In the circumstances of this case, it is enough to note that, at oral argument, Guangdong in essence conceded that Commerce's failure to comply with § 351.303(f)(3)(ii) did not cause even a de minimus injury related to the rights and interests that the regulation protects.

to confer a procedural benefit – service of notice provisions generally provide predictability in the administrative review process, and time for respondents to prepare a response.[7] PAM, 395 F. Supp. 2d at 1343. The notification provision at issue in Intercargo, for example, was designed "to increase certainty in the customs process by apprising the importer and its surety of the precise period within which final action would be taken on the liquidation . . . ." 83 F.3d at 396. Similarly, the D.C. Circuit has found that the FAA's failure to comply with a regulation requiring thirty days notice prior to termination of an employment contract was a procedure "aimed at protecting the [employee] from the Administrator's otherwise unlimited discretion." Lopez, 318 F.3d at 248. Respondents such as Guangdong rely on service of notice provisions, such as § 351.303(f)(3)(ii), to provide greater regularity in the administrative process and an opportunity to prepare for participation in an investigation before it begins. Thus, Guangdong will not be required to show that it suffered substantial prejudice in order to void the administrative review.

The mere fact that Guangdong is not required to show substantial prejudice does not mean that the court must void agency action that is conceded to have caused no harm at all. While Guangdong need not show "substantial prejudice," Commerce may show that the agency oversight was harmless error. At oral argument, counsel for Guangdong stated that it was not prevented in any way from preparing for, or participating in, the administrative review. Guangdong affirmatively stated that it suffered no prejudice, other than the fact that the administrative review took place. The plaintiff in Intercargo made a similar argument that "the prejudice flowing from this circumstance

_____

[7] The regulatory history for 351.303(f)(3)(ii) is very limited. The federal register notice proposing the provision states only that "[p]aragraph (f)(3)(ii) is new, and clarifies the requirements for service of requests of review." Notice of Proposed Rulemaking & Request for Pub. Comments, 61 Fed. Reg. 7308, 7326 (Dep't Commerce Feb. 27, 1996).

[failure to fully comply with a notice regulation] is the ultimate prejudice – the wrongful imposition of customs duty." 83 F.3d at 396. The Federal Circuit disagreed, stating that the loss of a case "is not what is meant by prejudice as used in this context." Id. There must instead be some indication that failure to comply with the regulation in some way inhibited Guangdong's presentation of its case. See id. at 396 ("Prejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect."). Because Guangdong in essence conceded that the failure to serve was harmless error, Commerce has met its burden to show its error was harmless. Guangdong's request that Commerce's administrative review be voided ab initio is denied.

## II.    Commerce's Choice of Data Source Is Not Supported by Substantial Evidence

Commerce is given wide discretion in the selection of data sources for use in administrative review. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999). The role of the court is to determine whether Commerce's choice of data was reasonable. When choosing a data source to estimate the surrogate value of an input, Commerce looks to a number of factors, including: 1) whether the data reflects non-export average values; 2) whether the data is contemporaneous with the period of investigation ("POI"); 3) whether the data is product specific; and 4) whether the data excludes taxes in its price. Taiyuan, 23 CIT at 706 (1999) (citing Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, 63 Fed. Reg. 16,758, 16,759 (Dep't Commerce Apr. 6, 1998) (final results of antidumping duty administrative reviews)). Guangdong concedes that the data it proposed and the data used by Commerce are identical with respect to all of these factors except for product

specificity.

Because India does not produce sebacic acid domestically, both Commerce and Guangdong relied on statistics of imports of sebacic acid into India to establish its surrogate value. As discussed, Commerce used import statistics based on the six-digit Indian HTS subheading 291713, a basket tariff category that includes both sebacic acid and azelaic acid. See Issues & Decision Mem., Pl.'s App. Tab 10, at 8–9.

Guangdong submitted comments requesting that Commerce adopt data taken from the Indian publication Chemical Weekly based on 1,400 kilograms of sebacic acid imported in two transactions from Germany to India. See Letter from Ronald M. Wisla, Garvey Schubert Barer, to Donald Evans, Sec'y Dep't of Commerce (Sept. 8, 2004) (submission of publically available information for use as surrogate value), P.R. Doc. 62, Pl.'s App. Tab 7, at Attach. 1 [hereinafter Guangdong Surrogate Value Submission].

Commerce expressed two reasons for rejecting the Chemical Weekly data. First, Commerce found that the Chemical Weekly data contained insufficient data points and "therefore [did not] represent a sufficiently broad range of import values on which to base the surrogate value for sebacic acid where alternative data are available." Issues & Decision Mem., Pl.'s App. Tab 10, at 7. Second, Commerce could not determine the accuracy of the Chemical Weekly data because it could not tell how the data was culled from the Indian government import statistics. Id.

In support of its own data, Commerce only conducted research into the relative prices of azelaic and sebacic acid in the United States to assure that the two products were similarly priced over a twenty-three-month period, determining that "[b]ecause the record does not include any

technical information on the more specialized production requirements for azelaic acid and because the attached dataweb query shows that the prices are not consistently higher than those for sebacic acid, we are unable to determine that azelaic acid is a specialty product." Price Comparison Mem., Pl.'s App. Tab 11, at 1. Commerce therefore found that "[t]he prices for azelaic acid and sebacic acid fluctuate with sebacic acid sometimes having the higher price, and, therefore, we do not see a clear pattern that azelaic acid is a higher priced product." Issues & Decision Mem., Pl.'s App. Tab 10, at 8.

Even if the court were to conclude that Commerce produced substantial evidence demonstrating that azelaic and sebacic acid are priced similarly, that would not justify Commerce's decision to abandon a more product-specific data source. Commerce failed to address the data Guangdong used to corroborate its Chemical Weekly submission. Guangdong admitted the small size of its sample but submitted evidence designed to prove that the data were not aberrational. It corroborated its data using an average unit value of $3,061.54 per metric ton for sebacic acid in the United States (excluding data from non-market economies and subsidizing nations), data published in the September 6, 2004 edition of Chemical Market Reporter (listing sebacic acid in drums as $4,187.60 per metric ton), and data from Chemical Weekly for the POI reflecting the price of oxalic acid (asserted to be similar to sebacic acid) in India as $469.66 per metric ton. Guangdong Surrogate Value Submission, Pl.'s App. Tab 7, at 2–3.

Neither the Final Determination and the attached Issues and Decision Memorandum nor Commerce's brief specifically discusses the corroborating evidence Guangdong submitted to support the use of its product-specific import data, nor does either provide evidence demonstrating

that the values were in fact aberrational. Commerce's only objection, besides the small size of the sample, is that it "cannot determine how this categorization was derived from the official Indian government statistics." Issues & Decision Mem., Pl.'s App. Tab 10, at 8–9.

The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983). "The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" Id. at 52 (quoting Burlington Truck Lines, Inc. v. United States, 317 U.S. 156, 168 (1962)). Although an agency is not required to comment on every submission it receives, a pertinent submission, such as Guangdong's corroborating evidence, should not be ignored. See Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 780, 696 F. Supp. 642, 649 (1988) (the agency must discuss "material issues of law or fact"). This is particularly true in a case such as this, where Commerce departs from its generally expressed preference for product-specific data. See Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004).

Additionally, Commerce failed to consider or explain why its own sample of 10,100 kilograms of sebacic and azelaic acid was not aberrational compared with the same basket category in other years. "[I]f . . . import statistics are based on a small quantity of imports for the period of investigation, the Commerce practice is to determine if the price for those imports is aberrational." Shanghai Foreign Trade Enters. Co., Ltd. v. United States, 318 F. Supp. 2d 1339, 1350 (CIT 2004) (citing Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999)).

Guangdong identified for Commerce a number of logical inconsistencies in its surrogate value for sebacic acid that should have prompted Commerce to examine its own data. Guangdong argued that Commerce's value of $15,826.30 was over six times the commercial value of the product. Guangdong Surrogate Value Submission, Pl.'s App. Tab 7, at 1–2. Additionally, in the 2000-2001 administrative review, Sebacic Acid from the People's Republic of China, 67 Fed. Reg. 69,719 (Nov. 19, 2002) (final results of antidumping duty administrative review), Commerce found the same basket category established a surrogate value of $5,388.66 per metric ton. See Decision Mem., A-570-825 at 17 (Mar. 23, 2005), available at http://ia.ita.doc.gov/frn/summary/2005mar.htm (discussing surrogate value of sebacic acid used in 2002).[8] Commerce noted Guangdong's objection that the surrogate value was "over six times the commercial value of the subject merchandise," but did not cite evidence explaining the inconsistency. Issues & Decision Mem., Pl.'s App. Tab 10, at 3, 8–9. Nor did Commerce determine the total size of the Indian sebacic acid market to determine if it was commercially and statistically significant. Having failed to consider whether the $15,826.30 figure derived from the basket category was aberrational despite evidence of its wide variation from the value of the same basket category in another year, Commerce failed to present substantial evidence supporting its surrogate

_____

[8] The Court also notes that Commerce recently abandoned a surrogate value of $15,826.30 for sebacic acid in the context of another administrative review. Decision Mem., A-570-825 (Mar. 23, 2005), available at http://ia.ita.doc.gov/frn/summary/2005mar.htm. Commerce found that "information on the record of this changed circumstances review indicates that the POR average sebacic acid surrogate value in the Indian six-digit category that we used in the preliminary results of this changed circumstances review is significantly higher than the import value of the previous period." Id. at 17. Commerce therefore eliminated the highest and lowest value countries (imports from the United States and Germany, respectively) and arrived at a value of $5,459.72 per metric ton, "which was in line with other sebacic acid prices on the record." Id.

value for sebacic acid.  See Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir.

2005) (agency decision not supported by substantial evidence if the agency "'entirely failed to

consider an important aspect of the problem [or] offered an explanation for its decision that runs

counter to the evidence before the agency'") (quoting State Farm, 463 U.S. at 43) (emphasis

removed).  Accordingly, the court will remand this issue to Commerce for reconsideration.

**III.     By-Product Credit**

Commerce requests that the court remand Commerce's application of the by-product

credit.  The issue is remanded.

**CONCLUSION**

Commerce's calculation of the surrogate value of sebacic acid is not supported by

substantial evidence and is therefore REMANDED for further consideration consistent with this

opinion.  Commerce's application of the by-product credit is likewise remanded.  Commerce shall

reconsider these matters and issue a determination within 45 days after the issuance of this opinion.

Guangdong will have 15 days to file objections to Commerce's remand determination.  Commerce

will have 11 days to file its response.

                                                            /s/            Jane A. Restani
                                                    Jane A. Restani
                                                    Chief Judge

Dated:  This 25th day of January, 2006.
          New York, New York