**Slip Op. 06-65**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

| | |
|---|---|
| GOLDLINK INDUSTRIES CO., LTD., TRUST CHEM CO., LTD., TIANJIN HANCHEM INTERNATIONAL TRADING CO., LTD., | : |
| Plaintiffs, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : Consol. Court No. 05-00060 |
| and | : |
| NATION FORD CHEMICAL COMPANY and SUN CHEMICAL CORPORATION, | : |
| Defendant-Intervenors and Plaintiffs, | : |
| and | : |
| CLARIANT CORPORATION, | : |
| Defendant-Intervenor and Plaintiff. | : |

[Held: Cross-motions for summary judgment are granted in part and denied in part, remanded for further determinations]

Dated: May 4, 2006

Garvey Schubert Barer (William E. Perry, Lizbeth R. Levinson, and Ronald M. Wisla) for Goldlink Industries Co., Ltd., Trust Chem Co., Ltd., and Tianjin Hanchem International Trading Co., Ltd., Plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Stephen C. Tosini); of counsel: Dean A. Pinkert, Office of the Chief Counsel for Import Administration, United States

Department of Commerce, for the United States, Defendant.

Pepper Hamilton LLP (Gregory C. Dorris, Edward M. Andries and Fidelis I. Agbapuruonwu) for Nation Ford Chemical Company and Sun Chemical Corporation, Defendant-Intervenors and Plaintiffs.

Barnes, Richardson & Colburn (Matthew T. McGrath and Stephen W. Brophy) for Clariant Corporation, Defendant-Intervenor and Plaintiff.

## OPINION

**TSOUCALAS, Senior Judge:**  This consolidated action concerns claims raised by Plaintiffs, Goldlink Industries Co., Ltd., Trust Chem Co., Ltd., and Tianjin Hanchem International Trading Co., Ltd. (collectively, "Goldlink"), and Defendant-Intervenors and Plaintiffs, Nation Ford Chemical Company and Sun Chemical Corporation (collectively, "Nation Ford"), and Clariant Corporation ("Clariant"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce's") final determination, entitled Notice of Final Determination of Sales at Less Than Fair Value for Carbazole Violet Pigment 23 from the People's Republic of China ("Final Determination"), 69 Fed. Reg. 67,304 (Nov. 17, 2004).

Goldlink, Nation Ford and Clariant contend that various aspects of the Final Determination are not supported by substantial evidence or in accordance with law.  Goldlink argues that substantial evidence on the record does not support Commerce's

decision to apply total adverse facts available to Tianjin Hanchem International Trading Co., Ltd. ("Hanchem").[1]  Goldlink also argues that Commerce incorrectly chose one Indian company's financial data as opposed to other Indian companies for surrogate financial ratios in calculating normal value.  Nation Ford and Clariant, (together, "Defendant-Intervenors"), separately contend that Commerce erred regarding the same seven aspects of the Final Determination: (1) Commerce incorrectly classified benzene sulfonyl chloride under the Indian Tariff Schedule; (2) Commerce incorrectly valued the chemical inputs carbazole, sodium sulfide and calcium chloride; (3) Commerce failed to account for steam as a factor of production; (4) Commerce did not apply financial ratios to toll-manufacturing within Goldlink's supply chain; and (5) Commerce failed to include values for terminal charges and brokerage fees in capturing all necessary movement costs.

## BACKGROUND

This case concerns an antidumping duty order for carbazole violet pigment 23 ("CVP-23") from the People's Republic of China

---

[1]  Hanchem was established subsequent to the period of investigation out of the United States sales department of Tianjin Heng An Trading Co., Ltd. ("Heng An").  Heng An made the United States sales of CVP-23 during the period of investigation. Commerce determined to treat Hanchem and Heng An as a single entity for this antidumping duty review, which is not contested by the parties.  See Preliminary Results, 69 Fed. Reg. at 35,288 n.4.

for the period of investigation ("POI") covering April 1, 2003, through September 30, 2003.  See Final Determination, 69 Fed. Reg. at 67,304.  Commerce initiated the investigation on December 19, 2003.  See Notice of Initiation of Antidumping Duty Investigations for Carbazole Violet Pigment 23 from India and the People's Republic of China, 68 Fed. Reg. 70,761 (Dec. 19, 2003).  On June 24, 2004, Commerce published its preliminary determination, finding that CVP-23 was being sold at less than fair value.  See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination for Carbazole Violet Pigment 23 From the People's Republic of China ("Preliminary Results"), 69 Fed. Reg. 35,287, 35,288 (June 24, 2004).   In its Preliminary Results, Commerce selected India as the surrogate country, see Preliminary Results, 69 Fed. Reg. at 35,291, which it confirmed in its Final Determination.  See Final Determination, 69 Fed. Reg. at 67,305.  Commerce published its Final Determination on November 17, 2004.   See Final Determination, 69 Fed. Reg. at 67,304.   By reference in its Final Determination, Commerce incorporated its Issues and Decision Memorandum for the Final Determination of Carbazole Violet Pigment 23 from the People's Republic of China ("I & D Mem."), Admin. R. Doc. 172 (Nov. 8, 2004).   See Final Determination, 69 Fed. Reg. at 67,304.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "the court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" Am. Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp.

1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 487-88)).

## DISCUSSION

The antidumping review at issue involves CVP-23 from the People's Republic of China ("PRC"). See Final Determination, 69 Fed. Reg at 67,304. In conducting an administrative review, Commerce determines the antidumping duty margin by taking the difference between the normal value ("NV"), typically the home market price of the merchandise in the exporting country, and the United States price (also called export price) of the merchandise. See 19 U.S.C. § 1677b (2000). When the merchandise is produced in a non-market economy country ("NME"), as the PRC is here, there is a presumption that factors of production ("FOPs") are under the control of the state and home market sales are usually not reliable indicators of NV. See 19 U.S.C. § 1677(18)(A) & (C) (2000). As such, Commerce is to calculate NV by isolating each FOP in the production process in the NME country and assign it a value from a surrogate market economy country using the "best available information." 19 U.S.C. § 1677b(c)(1). An estimated amount for general expenses and profit are added to the total FOPs to ultimately derive the merchandise's price as it would be if the NME country was a market economy. See 19 U.S.C. § 1677b(c); Nation

Ford Chem. Co. v. United States, 21 CIT 1371, 1372, 985 F. Supp. 133, 134 (1997) (citations omitted), aff'd 166 F.3d 1373 (Fed. Cir. 1999).

The antidumping statute does not define the phrase "best available information," rather, it only provides that in valuing FOPs, Commerce shall use surrogate values that are "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). As such, Commerce is given broad discretion "to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994). Here, Commerce chose India as the surrogate country for China, see Preliminary Results, 69 Fed. Reg. at 35,291, which is uncontested by the parties. Furthermore, all companies in a NME country are presumed to be subject to governmental control and assigned a single antidumping duty rate unless the company can demonstrate an absence of governmental control. See e.g., Decca Hospitality Furnishings, LLC v. United States, 29 CIT ___, ___, 391 F. Supp. 2d 1298, 1300 (2005). Here, Commerce determined that Goldlink, Hanchem, Trust Chem Co., Ltd. and Nantong Haidi Chemical Co., Ltd. ("Haidi") were entitled to separate rates. See Preliminary Results, 69 Fed. Reg. at 35,289.

The Court's role in the case at bar is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.  See 19 U.S.C. §§ 1677b & 1516a.  The statute's silence regarding the definition of "best available information" provides Commerce with "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis."  Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001).[2]  Commerce's discretion in choosing its information is limited by the statute's ultimate goal "to construct the product's normal value as it would have been if the NME country were a market economy country."  Rhodia, Inc. v. United States, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001) (citations omitted).  While Commerce enjoys broad discretion in determining what constitutes the best information available to calculate NV, Commerce may not act arbitrarily in reaching its decision.  See Crawfish Processors Alliance v. United States, 28 CIT ___, ___, 343 F. Supp. 2d 1242, 1251 (2004).  If Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce.

---

[2]     Furthermore, in evaluating the data, the statute does not require Commerce to follow any single approach.  See Luoyang Bearing Factory v. United States, 26 CIT 1156, 1172, 240 F. Supp. 2d 1268, 1284 (2002).

**I.   Commerce's Determination to Apply Total Adverse Facts Available to Hanchem Is Not Supported by Substantial Evidence on the Record**

   **A.   Contentions of the Parties**

      **1.   Goldlink's Contentions**

Goldlink argues that Commerce's decision to apply total adverse facts available to Hanchem is unsupported by substantial record evidence and is otherwise not in accordance with law. See Br. Supp. Pls.' R. 56.2 Mot. J. Agency R. ("Goldlink's Br.") at 8-18. Specifically, Goldlink states the plain language of the Verification of Tianjin Hanchem International Trading Co., Ltd. ("Verification Report"), Confidential Admin. R. Doc. 64, details the overall harmony between Hanchem's questionnaire responses and documents examined at verification. See Goldlink's Br. at 10. Goldlink asserts that the Verification Report states that Commerce was able to verify Hanchem's corporate structure, ownership and separate rates with no discrepancies. See id. The Verification Report, however, notes that sales values could not be easily reconciled to sales quantities regarding some of the invoices. See id. Goldlink explains these slight discrepancies existed because either Hanchem's United States customer 1) purchased equipment for Hanchem and deducted that value from monies owed or 2) was instructed by Hanchem's owner to deposit partial payment for monies owed into the owner's personal bank account. See id. at 10-12.

Goldlink argues that Hanchem explained these discrepancies at verification and with the exception of one invoice, Commerce was able to tie invoices to ledgers or accounts. See Goldlink's Br. at 10-12. Moreover, Goldlink argues that even if Commerce did not accept Hanchem's explanation regarding the discrepancies, Commerce is still not justified in applying total adverse facts available. See id. at 12-17. Goldlink argues that Commerce is unreasonably applying adverse facts when a company did not maintain its business records to Commerce's specifications. See id. at 13-14. Goldlink asserts that it is reasonable for Commerce to rely on records outside of Hanchem's financial statements during verification. See Reply Br. Pls. Goldlink Indus. Co., Ltd. et. al. ("Goldlink's Reply") at 5-6. Furthermore, Commerce has relied on records outside of a respondent's financial statements in other situations without automatically applying adverse facts available. See id.

Rather, Goldlink asserts that Commerce should apply facts otherwise available under 19 U.S.C. § 1677e(a). See Goldlink's Br. at 15-18. Here, Hanchem's owner was present at verification and was able to link monies received from United States customers to invoices in the various accounts. See id. at 14. While Hanchem's records were not perfect, Goldlink argues that they were adequate for normal commercial practices in China. See id. at 17. Goldlink indicates that Hanchem reasonably anticipated a favorable final

determination and thus had every incentive to fully cooperate in verification. See Goldlink's Br. at 12. Hanchem provided requested information by applicable deadlines and did not act to impede proceedings, mislead Commerce, or engage in misrepresentations of any kind. See id. at 4.

### 2. Commerce's Contentions

Commerce responds that Hanchem failed to reconcile its United States sales data at verification. See Def.'s Resp. Pls.' Mot. J. Upon Admin. R. ("Commerce's Resp.") at 12. Specifically, Hanchem could not provide a direct documentary link between United States invoices and payments recorded on Hanchem's books and records. See id. at 14. Commerce reasons that the Verification Report does not contain conclusions as to whether Hanchem "'passed' or 'failed' verification," but rather clearly states that "indirect inferences would have to be made if a substantial portion of the United States sales data were to be reconciled." Id. at 15. Inferences included "indirect and inexact" evidence presented at verification showing "more or less" the right amounts going into Hanchem's accounts around the right time. See id. at 16. Thus without direct documentation, Commerce argues it reasonably concluded that such inferences were not a reliable basis to use Hanchem's reported sales values. See id. at 15 & 17. Commerce also states that Hanchem did not act to the best of its ability because Hanchem

failed to "timely disclose that its financial statements omitted certain Untied States sales and failed to keep accurate books and records." Commerce's Resp._ at 18. Thus, in accordance with the Court of Appeals for the Federal Circuit's holding in Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003), Commerce argues that it may draw adverse inferences because Hanchem reasonably should have been more forthcoming in advance to verification. See Commerce's Resp. at 18-19. Accordingly, Commerce's conclusion that Hanchem did not fully cooperate is supported by substantial evidence and is otherwise in accordance with law. See id. at 20.

### 3. Nation Ford and Clariant's Contentions

Defendant-Intervenors both contend that Commerce's application of total adverse facts available to Hanchem is supported by substantial evidence and otherwise is in accordance with law. See Resp. Br. Nation Ford Chem. Co. & Sun Chem. Corp. Opp'n Pls.' Rule 56.2 Mot. J. Agency R. ("Nation Ford's Resp.") at 5; [Clariant's] Resp. Br. Opp'n Pl. Goldlink's Mot. J. Agency R. ("Clariant's Resp.") at 5. Clariant argues that Goldlink's contention, that Commerce was able to verify Hanchem's sales without issue, is contradicted by the Verification Report. See Clariant's Resp. at 6-7. Rather, the Verification Report never states that Commerce accepted Hanchem's explanations. See id. at 7. It also notes that

while Hanchem explained the discrepancies, Hanchem neither created nor maintained any paperwork outlining the commingled account payment transactions. See Nation Ford's Resp. at 10; Clariant's Resp. at 7. Thus, Hanchem's failure to keep or maintain adequate records supports Commerce's decision to apply total adverse facts. See id.; Clariant's Resp. at 7. Hanchem asked Commerce to accept indirect inferences based on values and approximations of payment dates as verification for its explanation of the discrepancies. See id. at 10 & 13; Clariant's Resp. at 8-9. Nation Ford also argues that Hanchem offers facts to the Court that are outside the official record. See Nation Ford's Resp. at 5. Nation Ford states that Hanchem's questionnaire responses failed to provide any detail of its accounting practices. See id. at 6-8. Thus, Commerce followed with a supplemental questionnaire, which Hanchem also failed to answer fully. See id. Commerce provided Hanchem with a verification outline in advance explaining what it expected to be able to verify including the documentation it expected to see, and Hanchem failed to inform Commerce in advance that it would not be able to provide the requested documents. See id. at 9. By not informing Commerce before verification of its accounting practices, Hanchem failed to cooperate to the best of its ability, thus application of total adverse facts is reasonable. See id. at 13-14; Clariant's Resp. at 9-10.

B.    Analysis

Section 1677e(a) of Title 19 of the United States Code mandates that Commerce use "facts otherwise available" in an antidumping proceeding if "(1) necessary information is not available on the record, or (2) an interested party or any other person-- (A) withholds information that has been requested . . . or (D) provides such information but the information cannot be verified . . . in reaching the applicable determination under this subtitle."  19 U.S.C. § 1677e(a) (2000).  The "focus of subsection (a) is a respondent's failure to provide information."  Nippon Steel, 337 F.3d at 1381 (emphasis retained).  The legislative goal behind Commerce's right to use facts available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ."  Nat'l Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994).  Consequently, Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available.  See generally, Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1572 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion to use facts available, but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).

Furthermore, if Commerce determines that "an interested party has failed to cooperate by not acting to <u>the best of its ability</u> to comply with a request for information," Section 1677e(b) grants Commerce the <u>discretion</u> to use adverse inferences when relying on information from an array of "facts otherwise available" sources. <u>See</u> 19 U.S.C. § 1677e(b) (<u>emphasis</u> <u>added</u>) ("may" as opposed to "shall" in Section 1677e(a)); 19 C.F.R. § 351.308(c) (2003). When Commerce concludes that a party has not cooperated to the best of its ability and applies adverse inferences, it must make two showings. <u>See</u> <u>Nippon Steel</u>, 337 F.3d at 1382-83. First, Commerce "must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained . . .." <u>Id.</u> And second, Commerce must then "make a subjective showing that the respondent . . . not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation . . .." <u>Id.</u> Moreover, while Commerce has broad discretion, it may not be overly punitive in its selection of facts otherwise available. <u>See</u> <u>F.LLI De Cecco di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032-33 (Fed. Cir. 2000).

Commerce initially determined that Hanchem was eligible for a separate rate other than the PRC-wide rate, which was determined by

using facts otherwise available.  See Preliminary Determination, 69

Fed. Reg. at 35,289.   In its Final Results, however, Commerce

determined that while Hanchem was not a part of the PRC entity, it

chose to apply "as adverse facts available to Hanchem the same rate

as that applied to the PRC entity due to Hanchem's verification

failure."  Final Results, 69 Fed. Reg. at 67,305.  Commerce further

explained that it was

> unable to verify the accuracy of what Hanchem submitted
> to [Commerce] in its questionnaire responses.
> Specifically, we were unable to verify the reported
> value of Hanchem's sales to the United States during the
> POI.   Furthermore, for a significant percentage of
> Hanchem's reported U.S. sales, we were unable to verify
> the reported U.S. prices.

I & D Mem. at 33.  Commerce states that Hanchem could not provide

documentary evidence to verify its explanations of the

discrepancies and was asking Commerce to make indirect inferences

regarding amounts received for United States sales.  See Analysis

Memorandum for Final Determination for Tianjin Hanchem

International Trading Co., Ltd. ("Analysis Mem."), Confidential

Admin. R. Doc. 74 at 2 (Nov. 8, 2004).  Commerce also states that

Hanchem failed to inform Commerce that it did not have financial

statements that covered sales of the subject merchandise until the

first day of verification.  See id. at 3.  Commerce concluded that

Hanchem had not cooperated to the best of its ability, as required

by 19 U.S.C. § 1677e(b), because Hanchem "knew or should have know

[sic] the information requirements for reconciliation and failed

until the start of verification to notify [Commerce] that it would be unable [to] provide such information. Moreover, Hanchem failed to keep or maintain adequate records." Id. Therefore, Commerce applied total adverse facts available and assessed the PRC-wide antidumping duty rate to Hanchem of 217.94 percent. See Final Determination, 69 Fed. Reg. at 67,306.

The Court finds that Commerce's application of total adverse facts available to Hanchem is unsupported by record evidence. At verification, Commerce stated it could not reconcile revenue earned from United States sales to Hanchem's financial statements without making "a number of indirect inferences." Analysis Mem. at 2. The Court agrees with Commerce that it is reasonable that a responsible importer keep adequate records so that sales and amounts received can be correlated in a manner that does not involve a heavy reliance on inferences based on approximate amounts near approximate dates. Here, however, Commerce does not cite to any record evidence to reasonably warrant an application of total adverse facts available other than the discrepancies in verifying some but not all of Hanchem's United States sales. See Verification Report at 7. While Commerce's inability to reconcile Hanchem's United States sales affects Hanchem's export price value, it seems unreasonable to the Court that such would warrant an

application of <u>total</u> adverse facts.[3]  Commerce also states that during verification it "found no evidence that any U.S. sales were missing" from Hanchem's questionnaire responses and that it was able to directly tie certain invoices to the sales ledger. <u>Verification Report</u> at 6.  Furthermore, Commerce did not indicate that Hanchem was uncooperative during verification. See <u>id.</u> at 5-7.  If the inability to reconcile values here is of such consequence as to warrant application of <u>total</u> adverse facts available, then Commerce must reasonably support its determination with substantial evidence on the record.  The Court, therefore, remands this issue back to Commerce to re-examine its determination to apply <u>total</u> adverse facts rather than partial adverse facts for the unverifiable sales.

---

[3]    The Court recognizes that while each antidumping duty determination is decided case-by-case, there are situations where the application of total adverse facts is more than reasonable. See <u>e.g.</u>, <u>Crawfish Processors Alliance</u>, 28 CIT at ___, 343 F. Supp. 2d at 1270-71 (where a respondent did not participate in verification and its affiliated company failed to contact or arrange verification); <u>Notice of Preliminary Results of Antidumping Duty Administrative Review; Final Rescission, in Part; and Intent to Rescind, in Part of Freshwater Crawfish Tail Meat from the People's Republic of China</u>, 68 Fed. Reg. 58,064, 58,067 (Oct. 8, 2003), Verification Report of Weishan Fukang Foodstuffs Co., Ltd., (where a respondent actively countermined verification after Commerce arrived and had begun verification).

## II.  Commerce Failed to Adequately Explain Its Determination That Subsidies Did Not Distort Pidilite's Financial Ratios

### A.  Contentions of the Parties

#### 1.  Goldlink's Contentions

Goldlink challenges Commerce's decision to use data from Pidilite Industries, Ltd. ("Pidilite"), an Indian producer of CVP-23, as surrogate financial ratios rather than data from the Reserve Bank of India ("RBI") or other Indian companies. See Goldlink's Br. at 18-34.  Specifically, Goldlink states that Commerce determined in a simultaneous countervailing duty ("CVD") investigation of CVP-23 from India that Pidilite received four different subsidies from the Government of India and assessed a CVD margin of 17.93 percent ad valorem. See id. at 18-20.  Goldlink contends that the subsidies distort Pidilite's financial statements, thus making them unreliable for the purposes of calculating surrogate financial ratios. See id. at 19.  Commerce itself, Goldlink asserts, is going against its preferred practice of using "where possible," data that is not distorted or otherwise unreliable.  See id. at 22.  Goldlink also asserts that the subsidies Pidilite received are of a magnitude similar to other situations where Commerce has rejected surrogate financial ratios from subsidized companies. See id. at 22-24. Goldlink argues that the subsidies Pidilite received either reduced the cost of materials or increased profit through increasing revenues or

decreasing taxes. See Goldlink's Br. at 28-29. Goldlink maintains that Commerce did not adequately explain why Pidilite's subsidies did not distort their financial statements, thus Commerce's determination to use Pidilite's data is not supported by substantial evidence. See id. at 24-28. Rather, Commerce merely "restate[s] the regulatory standard, reviewed the positions of the parties and stated its conclusion bereft of any fact-finding or independent analysis." Id. at 25. Goldlink also asserts that the burden lies with Commerce to select the best surrogate information available, not with itself to show that the subsidies distorted Pidilite's financial statements. See Goldlink's Reply at 10-11.

Moreover, instead of using Pidilite's data, Goldlink argues that Commerce should rely upon data from the RBI or include other Indian company data. See Goldlink's Br. at 29-32. Goldlink states that Commerce has used RBI data for surrogate financial ratios when company specific data is either unavailable or not reliable. See id. at 29. Since Pidilite's data is distorted, Goldlink reasons that the RBI data is the best available information. See id. at 30. Goldlink also argues, in the alternative, that if Commerce uses data from Indian companies, then its decision to reject data from Navpad Pigment Pvt. Ltd. ("Navpad") and Nirvip Dyes & Chemical Pvt. Ltd. ("Nirvip") is not supported by substantial evidence. See id. at 30-32. Both Navpad and Nirvip are producers of CVP-23. See

id. at 31. Commerce's explanation for rejecting their data is because their financial statements were not accompanied by an auditor's certification. See id. Goldlink states that both companies' financial statements were audited and certified by independent chartered Indian accountants, as was Pidilite's financial statements. See id. at 31-32. Goldlink argues that Commerce favorably distinguishes Pidilite's data because it was published on the Internet. See id. Goldlink asserts that Commerce should average Navpad and Nirvip's data for surrogate financial ratios and exclude Pidilite's data because it is distorted. See id. at 32-34.

### 2. Commerce's Contentions

Commerce responds that its decision to rely upon Pidilite's financial statements to calculate surrogate financial ratios and reject the RBI and other Indian companies' data is supported by substantial evidence and in accordance with law. See Commerce's Resp. at 26. Commerce states it examined whether Pidilite's financial statements had been systematically skewed by subsidies and determined that the record evidence did not support such a conclusion. See id. at 21. Thus, Commerce followed its normal preference to use data based on the production of identical merchandise, which Pidilite satisfies here. See id. Furthermore, Commerce argues it properly rejected data from Navpad and Nirvip

because such financial statements were not accompanied by an
auditor's certification. See id. at 21.

Specifically, Commerce argues that Goldlink failed to
demonstrate that the subsidies Pidilite received distorted its
financial statements "as a whole by a significant amount . . .."
Commerce's Resp. at 21 (emphasis retained). Therefore, it was
reasonable for Commerce to rely upon such data. See id. Moreover,
Commerce argues that Pidilite's financial statements also support
Commerce's determination. See id. Pidilite's data indicated that
the overwhelming bulk of countervailable subsidies received were in
the general category of "other income." See id. at 21-22. Any
export incentives received could only have had a minuscule effect
on profit ratios. See id. at 22. Commerce also asserts that the
state sales tax deferrals Pidilite received were negligible when
compared to the export incentives and not taken into account when
determining profits. See id. at 22-23. Commerce states that
Goldlink's contention that Commerce is not following its preferred
practice – disusing data from surrogate countries that grant
broadly available non-industry specific export subsidies – is
obfuscating the reasoning behind Commerce's policy. See id. at 23.
Broadly available non-industry specific export subsidies can
directly reduce the price of a single exported FOP. See id.
Whereas, subsidization of exports of a single product that affect

a company's entire bottom line must be averaged over the company's gross revenues. See Commerce's Resp. at 23-24. Therefore, since Pidilite's financial ratios were not distorted to any significant degree by the subsidies it received, rather than affecting a single FOP, Commerce maintains that it reasonably relied upon such data. See id. Commerce further states that Goldlink failed to clearly demonstrate how the subsidies Pidilite received systematically distorted its financial ratios. See id. at 24-25.

Commerce rejected data from Navpad and Nirvip because their financial statements lacked an auditor's certification. See id. at 21. While Goldlink argues that these financial statements had stamps and signatures purporting review by auditors, Commerce states that they actually lacked "certification by the auditor, i.e., a statement explicitly stating precisely what the auditor did and what the auditor found." Id. at 25 (emphasis retained). Commerce states that its decision to reject Navpad and Nirvip's data is reasonable because it requires properly certified financial statements for purposes of calculating financial ratios. See id. at 26.

### 3. Clariant and Nation Ford's Contentions

Defendant-Intervenors also respond that Commerce's decision to use Pidilite data for surrogate financial ratios is supported by substantial evidence. See Nation Ford's Resp. at 17; Clariant's

Resp. at 11. Nation Ford argues that the Pidilite data satisfies Commerce's regulations for valuing manufacturing overhead, general expenses and profit. See Nation Ford's Resp. at 17-18. Commerce has consistently held that the mere receipt of government subsidies does not necessarily mean that a company's financial ratios are unusable. See id. at 19; Clariant's Resp. at 11. Defendant-Intervenors state that Goldlink has greatly exaggerated the alleged distortion that the subsidies may have caused in Pidilite's financial statements. See id. at 20; Clariant's Resp. at 12. Furthermore, Nation Ford argues that Goldlink has unsuccessfully questioned Pidilite's financial ratios on three separate occasions, each rejection well reasoned by Commerce. See Nation Ford's Resp. at 18-20. Goldlink, both here and at Commerce, has failed to demonstrate that the subsidies systematically distort Pidilite's financial ratios. See id. at 20-21; Clariant's Resp. at 12-13. Accordingly, Commerce's decision to reject the non-company specific data from the RBI is also supported by substantial evidence. See id. at 23; Clariant's Resp. at 13-14.

Defendant-Intervenors further respond that Commerce's decision to reject financial statements from Navpad and Nirvip because they were incomplete is also supported by substantial evidence. See Nation Ford's Resp. at 23; Clariant's Resp. at 14. Nation Ford emphasizes that the Pidilite data is reliable because it included

a complete auditors report with a summary of the audit and an opinion approving the completeness and accuracy of the data in accordance with Indian generally accepted accounting principles. See Nation Ford's Resp. at 24-25. Furthermore, Nation Ford indicates that the record does not contradict Goldlink's assertion that Navpad's and Nirvip's financial statements were "stamped and signed." See id. at 24. Rather, these financial statements lacked an "auditor's certification," and the record does not indicate that an accountant's stamp and signature alone is in accordance with Indian generally accepted accounting principles. See id.; Clariant's Resp. at 14. Commerce followed its long stated preference for selecting financial statements that have been audited, which is reasonable and should be affirmed. See id. at 25-27; Clariant's Resp. at 14.

### B. Analysis

In calculating NV, Commerce must include a company's "general expenses and profit," i.e., those not traceable to a specific product, which is referred to as a company's "financial ratios" and include factory overhead, selling, general and administrative ("SG&A") expenses and profit. See 19 U.S.C. § 1677b(c)(1); Peer Bearing Co. v. United States, 25 CIT 1199, 1214, 182 F. Supp. 2d 1285, 1303-04 (2001). The antidumping duty statute authorizes, but does not mandate that Commerce use surrogate countries to estimate

the value of the FOPs.  See 19 U.S.C. § 1677b(c)(1).  When using surrogate values, however, Commerce shall use the "best available information."  Id.  In legislative history, Congress provided Commerce with guidance by stating that, "[i]n valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Conf. Rep. No. 100-576 at 590 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("House Report").  The House Report further states that, "the conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time."  H.R. Conf. Rep. No. 100-576 at 590-91, reprinted in 1988 U.S.C.C.A.N. at 1623-24.

In its Preliminary Determination, Commerce acknowledged that it had preliminarily determined in a companion CVD case for India that Indian CVP-23 producers and exporters were receiving countervailable subsidies.  See Preliminary Determination, 69 Fed. Reg. at 35,292.  Commerce also stated that the receipt of government subsidies does not necessarily mean that a company's financial ratios are unusable.  See id.  Thus, Commerce determined that Pidilite's audited financial statements were usable as surrogate financial ratios.  See id.  In its I & D Mem., Commerce

stated that its preference is to use, "where possible, the financial data of surrogate producers of identical merchandise, provided that" the data is "not distorted or otherwise unreliable." I & D Mem. at 7.   Here, Commerce determined that there was insufficient reason to reject Pidilite's financial statements on the basis of an affirmative CVD determination.  See id.  Commerce again reiterated that the mere existence of a subsidy is not, in itself, sufficient evidence of such a distortion.  See id. (citing Final Results of Antidumping Duty Administrative Review of Persulfates from the People's Republic of China, 68 Fed. Reg. 6,712 (Feb. 10, 2003).  Furthermore, Commerce determined that the RBI data was not the best available information because financial data from a producer of identical merchandise exists and rejected the Navpad and Nirvip data because their financial statements were not accompanied by an auditor's certification.  See id.

The Court finds that Commerce has not fully explained its determination that subsidies did not render Pidilite's financial ratios unusable.  Commerce must use data that is not distorted or otherwise unreliable to determine NV.  See 19 U.S.C. § 1677b(c); Lasko Metal, 43 F.3d at 1443 (duty to determine margins as accurately as possible).  Since the presumption is that NME data is distorted, Commerce must find a reasonable surrogate value. Logically then, Commerce cannot use a surrogate value if it is also

distorted, otherwise defeating the purpose of using a surrogate value rather than the actual export value. While, it is reasonable that the mere presence of subsidies does not necessarily mean the financial ratios are distorted, Commerce must explain its determination that Pidilite's financial ratios are not distorted by the subsidies it received here. Commerce merely states that the parties had not demonstrated that the subsidies "systematically distort Pidilite's financial ratios." I & D Mem. at 7. Other than the affirmative CVD determination, Commerce asserts that Pidilite's financial statements are the best available information on the record. See id. While Pidilite's financial ratios may be the best information available, the Court finds that Commerce's conclusory statement is not clearly supported in the record. Thus, the Court is unable to determine whether Commerce's decision is reasonable. The Court acknowledges that its review is limited to sustaining Commerce if one could reasonably conclude that Commerce chose the best available information, even if the Court would have preferred other data, but that is not yet the case here. Commerce must first explain its choice. Therefore, the Court remands this issue to Commerce to further explain its determination in detail, specifically how the subsidies Pidilite received did not distort its financial ratios rendering them unusable.

The Court sustains Commerce's decision to reject data from the RBI because the companies represented therein reflect non-CVP-23 producers, which is reasonable when data from a CVP-23 producer is available. See 19 U.S.C. § 1677b(c)(4). The Court also finds that Commerce's rejection of data from Navpad and Nirvip because of the absence of a auditor's certification is reasonable given that better available information exists in the record. The Court, however, notes that if on remand, Commerce determines that Pidilite's financial statements are distorted due to the subsidies received, then Commerce should look at all the information on the record anew to determine what is the best available information. If none of the information on the record is satisfactory, then Commerce should reopen the record to obtain more information regarding either the existing sources or new ones.

## III. Surrogate values

Defendant-Intervenors separately and identically contest Commerce's selection of surrogate values for five FOPs. See Mem. Law Pls.' Nation Ford Chem. Co. & Sun Chem. Corp. Supp. Rule 56.2 Mot. J. Agency R. ("Nation Ford's Mem.") at 10-17; Mem. Supp. [Clariant] Pl.-Intervenor's Mot. J. Agency R. ("Clariant's Mem.") at 2-3. Specifically, Defendant-Intervenors argue that: 1)Commerce chose the incorrect tariff classification from the Indian tariff schedule for valuing benzene sulfonyl chloride; 2) Commerce

incorrectly values carbazole by using a basket category import price rather than a more specific import price; 3) Commerce incorrectly valued sodium sulfide based on an import price rather than the concentration specific prices available in Chemical Weekly, an Indian publication; 4) Commerce used the incorrect concentration price for calcium chloride rather than adjusting for the different concentration levels reported by the Chinese producers; and 5) Commerce failed to account for steam as a factor of production. See Nation Ford's Mem. at 10-17; Clariant's Mem. at 2-3. Commerce has requested a voluntary remand on the issues of benzene sulfonyl chloride, calcium chloride and steam. See Commerce's Resp. at 34-36. Specifically, Commerce concedes that it incorrectly valued benzene sulfonyl chloride using import data from the Indian harmonized tariff schedule for a different chemical. See id. at 34. Regarding calcium chloride, Commerce relied on calcium chloride values from Chemical Weekly based on a 70 percent concentration, while Goldlink's data reported using calcium chloride at a 100 percent basis, which was not contradicted at verification. See id. Therefore, Commerce requests a voluntary remand to adjust for concentration levels where the Chemical Weekly data relied upon was expressed at a 70 percent concentration. See id. at 35. Commerce also states that although it found that steam was a FOP for CVP-23, there was no information on the record to value steam. See id. Commerce further declined to value steam

using the United States price quotes provided by the Defendant-Intervenors because of its longstanding practice to reject United States prices. See Commerce's Resp. at 35. Therefore, Commerce declined to select a value for steam. See id. Commerce now requests a remand to reopen the record and gather new evidence to determine a statutorily permissible surrogate value for steam. See id. at 36. The Court grants Commerce's request for voluntary remand, which the Court will then review, but also notes that Commerce should thoroughly explain its reasoning. Accordingly, the Court will address in turn the remaining two surrogate values still at issue.

### A. Commerce Properly Selected Indian Import Prices as the Surrogate Value for Sodium Sulfide

#### 1. Parties' Contentions

Defendant-Intervenors argue that Commerce incorrectly valued sodium sulfide using Indian import prices rather than the concentration specific prices available in Chemical Weekly. Defendant-Intervenors argue that CVP-23 can be made with different concentrations of sodium sulfide and the Chinese producers reported specific concentrations purchased. See Nation Ford's Mem. at 12-14; Clariant's Mem. at 11. Thus, Defendant-Intervenors assert that the value of sodium sulfide should be based on concentration specific prices. See id.; Clariant's Mem. at 11-12. Furthermore, Commerce failed to explain its decision to use import prices

deviating from its preference to use domestic data, like the Chemical Weekly information submitted by Defendant-Intervenors. See Reply Br. Clariant Corp. ("Clariant's Reply") at 6.

Commerce responds that it valued sodium sulfide using non-aberrational Indian import prices because such prices satisfied its criteria for selecting surrogate values and thus is supported by substantial evidence. See Customs' Resp. at 28. Customs states that its three criteria for selecting surrogate value information are: 1) that the information be publicly available, 2) be representative of a range of prices within the POI, and 3) be product-specific and tax-exclusive. See id. at 28-29. While Defendant-Intervenors urge Commerce to use concentration specific prices listed in Chemical Weekly and while Commerce states that it may make an adjustment for reported concentration levels, Commerce does not select sources for surrogate values based on concentration levels. See id. at 29. Commerce further states that "although sodium sulfide was reported as a factor of production on a 100-percent concentration basis, it would not be appropriate to make an adjustment where the surrogate value source does not indicate concentration levels." Id. The Indian import prices that Commerce chose to value sodium sulfide satisfy its three criteria, and accordingly, Commerce argues, its decision is supported by substantial evidence. See Customs' Resp. at 30.

Goldlink also responds that Commerce properly determined the value for sodium sulfide using the best information available. See Def.-Intervenors Goldlink et al.'s Opp'n Pl. Nation Ford Chem. Co.'s &Pl.-Intervenor Clariant Corp.'s Rule 56.2 Mot. J. Agency R. ("Goldlink's Resp.") at 7. Goldlink states that Commerce has broad latitude in choosing surrogate value information, which is entitled to deference. See id. Here, Goldlink notes that Commerce did not find the sodium sulfide data as "aberrational or otherwise unusable" when it determined import statistics for other FOPs were aberrational. Id. at 7-8. Goldlink argues that Defendant-Intervenors' contention that the Chemical Weekly data is better than the Indian import prices is a decision that Commerce has determined in the negative. See id. at 8. Without citing record evidence that undermines the reliability of the Indian import statistics, Commerce's decision is entitled to deference. See id.

### 2. Analysis

The Court rejects Defendant-Intervenors' complaint that Commerce erred in using Indian import prices rather than Chemical Weekly prices. In valuing FOPs in the NME country context, Commerce enjoys considerable discretion. See Lasko, 43 F.3d at 1446. Commerce chose Indian import prices as surrogate values for all but four of the material inputs, including sodium sulfide. See Preliminary Determination, 69 Fed. Reg. at 35,291. Commerce

explained its three criteria for selecting surrogate value information, which do not include adjustment for concentration levels. See I & D Mem. at 12. Furthermore, Commerce stated it considered "quality, specificity, and contemporaneity of the data." Preliminary Determination, 69 Fed. Reg. at 35,291. Specifically regarding surrogate values adjusted for chemical concentration levels, Commerce stated that it "would not adjust surrogate values to reflect purity levels when the surrogate value sources do not indicate levels of purity which can be used for comparison purposes." I & D Mem. at 16. While Defendant-Intervenors prefer the Chemical Weekly data, Commerce recognizes that Chemical Weekly prices are based on 100-percent purity unless indicated otherwise. See id. Commerce argues that no grounds exist to adjust prices because respondents reported factors on a 100-percent concentration basis, which Commerce verified. See I & D Mem. at 16; Nation Ford's Mem. at 12. The Court finds that Commerce's decision to use Indian import values for sodium sulfide is reasonable.

   **B.  Commerce Properly Selected Indian Import Prices as the Surrogate Value for Carbazole**

      **1.  Parties' Contentions**

Defendant-Intervenors initially argued that Commerce incorrectly valued carbazole using an import basket category rather than the more specific import prices. See Nation Ford's Mem. at 14; Clariant's Mem. at 9. Nation Ford then withdrew its challenge

to Commerce's surrogate value selection for carbazole. See Reply Br. Pls. Nation Ford Chem. Co. & Sun Chem. Corp. Supp. Rule 56.2 Mot. J. Agency R. ("Nation Ford's Reply") at 2.[4] Clariant continues to argue that basket categories are broad classifications including several different chemicals, which are not interchangeable in the production process. See Clariant's Mem. at 9. Thus, the basket category price has no direct relation to the import price of a specific input. See id. Clariant contends that Chemimpex, the Chemical Weekly database, is a satisfactory alternative source of surrogate values that Commerce unreasonably rejected. See id. at 10. The Chemimpex data, Clariant argues, meets Commerce's traditional criteria for surrogate values and moreover, is product specific whereas the basket category data is not. See id.

Commerce responds that it valued carbazole using Indian import prices rather than Chemimpex because the Indian import prices satisfied its surrogate value criteria. See Customs' Resp. at 30. Commerce concedes that the Indian import prices are from tariff classifications that slightly differ from the corresponding FOP. See id. at 31. Commerce argues, however, that relying on a basket category is not a sufficient basis to claim that Commerce failed to

---

[4] Clariant does not explicitly withdraw its challenge in its reply brief and did not attend oral arguments held before the Court on February 9, 2006. See Clariant's Reply at 1-10.

adhere to its own practice.  See id.

Goldlink also responds that Commerce valued carbazole using the best information available.  See Goldlink's Resp. at 8. Goldlink argues that Commerce has previously determined in an unrelated antidumping duty review that Chemimpex data is not as reliable as even a basket category of Indian import statistics. See id. at 8-9.  The Chemimpex data does not represent a sufficiently broad range of import values and does not necessarily conform to the categories in India's Harmonized Tariff Schedule. See id. at 9.  Thus, Commerce's decision to use the more reliable and representative prices in the Indian import statistics is supported by substantial evidence.  See id.

### 2.  Analysis

As noted above, Commerce has broad discretion in selecting which price from a surrogate country to use in valuing a particular FOP, while achieving the overarching goal to determine the margins as accurately as possible.  See Lasko Metal, 43 F.3d at 1443. While Defendant-Intervenors argue that the Chemimpex data satisfies Commerce's surrogate value criteria, Commerce determined that Indian import statistics are the best available surrogate value information to "value certain material inputs that are contained within Indian HTS basket categories . . .."  I & D Mem. at 15.  It is reasonable for Commerce to find official Indian government

statistics more reliable than Chemimpex data, given that the latter is derived from the former and the Chemimpex categories may not follow the Indian tariff schedule. See <u>Final Results of Antidumping Duty Changed Circumstances Review and Reinstatement of the Antidumping Duty Order of Sebacic Acid from the People's Republic of China</u>, 70 Fed. Reg. 16,218 (Mar. 30, 2005), <u>I & D Mem.</u> at Comment 4. Therefore, the Court finds that Commerce could reasonably determine that the Indian import prices are better available information than the Chemimpex data.

## IV. Commerce Failed to Include Indian Import Terminal Charges & Brokerage Fees in Calculating Movement Costs

### A.    Contentions of the Parties

Defendant-Intervenors assert that Commerce failed to account for all necessary movement costs, specifically brokerage fees and terminal charges, when it relied on the cargo, insurance and freight ("CIF") price from India. See Nation Ford's Mem. at 22; Clariant's Mem. at 17. Defendant-Intervenors argue that when Commerce decided to use surrogate import prices, it was necessary to include all relevant costs in India. See <u>id.</u>; Clariant's Mem. at 17. By failing to include the brokerage and terminal charges in the surrogate values of imported materials, Nation Ford argues that Commerce is using a surrogate import value that is inherently lower than the surrogate domestic value, which accounts for the brokerage and terminal charges. See Nation Ford's Mem. at 23. Nation Ford

also argues that whether Pidilite incurred brokerage and terminal charges is irrelevant because it is merely one of many Indian companies that imports merchandise. See Nation Ford's Reply at 8. Commerce is making an "arbitrary and artificial distinction between two groups of costs," brokerage and terminal versus freight, "both of which are real movement costs." Id. at 9. Therefore, Commerce should add brokerage fees and terminal charges to its surrogate values where it used Indian import prices to value material inputs. See Nation Ford's Mem. at 24; Clariant's Mem. at 17.

Commerce responds that there is no record evidence indicating that Pidilite incurred brokerage and terminal charges in acquiring the FOPs, and therefore, there is no basis to include these charges. See Commerce's Resp. at 32. Commerce states that it did not add the "additional [brokerage and terminal] costs involved in importing a product into the surrogate country because [it] is only concerned with valuing the cost of an input used by a surrogate producer, whether it be purchased domestically or imported." Id. (citing I & D Mem. at 24). Commerce argues that it is not required to obtain an "apples-to apples" comparison between Indian import and domestic prices. See id. at 33. Rather, "[v]aluing factors of production simply involves reasonable measure of the respondent's own cost of production," as required by 19 U.S.C. § 1677b(c)(1). Id. at 32. Absent evidence that the NME producer actually being

investigated incurred brokerage and terminal charges, Commerce argues that there is no basis to make such an adjustment. See id. at 33. Goldlink generally supports Commerce's position. See Goldlink's Resp. at 1.

### B.   Analysis

The Court finds that Commerce failed to capture all movement costs and should have included terminal charges and brokerage fees. Commerce has broad discretion in selecting which price from a surrogate country to use in valuing a particular FOP, while achieving the overarching goal to determine the margins as accurately as possible. See Lasko Metal, 43 F.3d at 1443. Here, Commerce has chosen primarily Indian import statistics as surrogate values for material inputs. See Preliminary Determination, 69 Fed. Reg. 35,291. In doing so, Commerce recognizes that while the import statistics may be the best available information, "importing material inputs may not be the experience of the surrogate producer." I & D Mem. at 24. Therefore, Commerce decided that it would not "add additional costs involved in importing a product into the surrogate country because [it] is only concerned with valuing the cost of an input used by a surrogate producer, whether [the input] be purchased domestically or imported." Id.

In a NME context, the antidumping statute directs Commerce to formulate the NV of the merchandise as accurately as possible based

on values for the FOPs. See 19 U.S.C. §1677b(c). Each identified FOP is assigned a surrogate value, i.e., their value in a market economy. See id. Here, Commerce chose Indian import prices as surrogate values for material inputs of CVP-23, instead of export prices or other available data such as Chemical Weekly. See Preliminary Results, 69 Fed. Reg. at 35,291. Commerce has the discretion to do so, as the evaluator of the best available information. In doing so, however, Commerce must account for the full cost of the material input, to ultimately satisfy its obligation to determine the margin "as accurately as possible." Lasko Metal, 43 F.3d at 1443. In regards to movement costs, this includes terminal charges and brokerage fees incurred in the importation of the material inputs for which Commerce used Indian import statistics.

The Court is unpersuaded by Commerce's argument that simply because the record evidence does not indicate that Pidilite incurred terminal charges and brokerage fees, such need not be included. Rather, Commerce is calculating a surrogate value for Chinese producers or exporters, and whether they incurred such movement costs is the more relevant focus. Furthermore, because the statute contemplates the ability of Commerce to draw FOP values from different surrogate producers, sources, countries or multiple surrogate countries, see generally Lasko Metal, 43 F.3d at 1446;

Peer Bearing, 25 CIT at 1214-17, 182 F. Supp. 2d at 1304-06, therefore allowing case-by-case determinations, then it makes no sense to require Commerce to include certain charges that may not always be incurred by the exporter.  Furthermore, Commerce has recognized that terminal charges and brokerage fees can be a part of movement costs because it has adjusted both NV and export price for such charges in other antidumping duty determinations.[5] Therefore, the Court remands this issue and Commerce must either include terminal charges and brokerage fees in movement costs or precisely and reasonably explain its decision to not include such costs here, given that its treatment of surrogate values differs from its treatment of producers or exporters under review.

---

[5]     See Notice of Preliminary Determination of Sales at Less Than Fair Value for Certain Automotive Replacement Glass Windshields From the People's Republic of China, 66 Fed. Reg. 48,233, 48,239-40 (Sept. 19, 2001) (deducting brokerage & terminal charges from export price); Preliminary Results of New Shipper Review and Antidumping Duty Administrative Review, and Rescission, in Part, of the Antidumping Duty Administrative Review of Oil Country Tubular Goods, Other Than Drill Pipe, From Korea, 67 Fed. Reg. 57,570, 57,573 (Sept. 11, 2002) (deducting brokerage & terminal charges from NV); Preliminary Results of Antidumping Duty Administrative Review of Certain Polyester Staple Fiber from Korea, 67 Fed. Reg. 39,350, 39,351 (June 7, 2002) (deducting brokerage & terminal charges from export price); but see Final Results and Partial Rescission of Antidumping Duty Administrative Review of Sulfanilic Acid From the People's Republic of China, 61 Fed. Reg. 53,702, 53,705 (Oct. 15, 1996) (rejecting a similar argument because "Indian Import Statistics . . . are reported on a CIF basis.  Thus, the reported import values include the costs of transporting the merchandise to India, and an adjustment for ocean freight from the port of export to India and for Indian port terminal and brokerage charges is not necessary.").

## V.   Commerce Properly Applied Pidilite's Financial Ratios to Multicolor's Toll Production

Jiangsu Multicolor Fine Chemical Co., Ltd. ("Multicolor") toll produced (also referred as subcontracting or leasing arrangement) CVP-23 exported by Goldlink during the POI. See Nation Ford's Mem. at 18; Clariant's Mem. at 15-16; Goldlink's Resp. at 12. Multicolor converted carbazole into nitroethylcarbazole, which was then sent to both Haidi and Nantong Longteng Chemical Co., Ltd. ("Longteng") for conversion into crude CVP-23. See id.; Clariant's Mem. at 16; Goldlink's Resp. at 12.  The crude CVP-23 was then returned to Multicolor for conversion into finished CVP-23.  See id.; Clariant's Mem. at 16; Goldlink's Resp. at 12.

### A.    Contentions of the Parties

Defendant-Intervenors contend that Commerce failed to properly account for certain costs in the toll production of crude CVP-23 within Goldlink's supply chain.  See Nation Ford's Mem. at 18; Clariant's Mem. at 16.  Defendant-Intervenors argue that Commerce incorrectly accounted for toll manufacturing by Haidi and Longteng by only valuing certain basic FOPs (material inputs, utility and labor) reported by Haidi and Longteng, treating the outsourcing as if it did not occur and Multicolor directly experienced those costs.  See id.; Clariant's Mem. at 16.  Rather, Defendant-Intervenors argue that Multicolor's receipt of crude CVP-23 in its tolling arrangement must account for factory overhead, SG&A, and

profit attributable to this outsourcing because the cost of the tolling is greater than the direct manufacturing costs. See Nation Ford's Mem. at 18; Clariant's Mem. at 16. By not attributing the full costs of the tolling arrangement, Commerce is failing to calculate the cost or price of CVP-23 that would be determined in a market economy country. See id. at 18-20; Clariant's Mem. at 16. Nation Ford argues that attribution of the tolling arrangement is not "double-counting, because the toll transaction as a cost to Multicolor is more than just the sum" of the costs of the basic FOPs. Nation Ford's Mem. at 20. Haidi and Longteng "separately incurred factory overhead and SG&A costs and are entitled to profit for their tolling operations" from Multicolor. Id. Therefore, since Commerce has failed to calculate the antidumping duty margin as accurately as possible, Defendant-Intervenors request a remand. See id. at 21; Clariant's Mem. at 17. On remand, Nation Ford requests that Commerce recalculate the cost of toll production by applying the financial ratios to the cost of materials, energy and labor in the toll production process. See Nation Ford's Reply at 15. Commerce should then include that figure as a separate cost in calculating Multicolor's cost of production of finished CVP-23. See id.

Commerce responds that its application of financial ratios to Multicolor is supported by substantial evidence and is in

accordance with law.  See Commerce's Resp. at 36.  Commerce argues that Defendant-Intervenors are essentially seeking to count expenses associated with Multicolor's tolling arrangement at certain stages of CVP-23 production more than once.  See id.  Since Pidilite is a fully integrated producer incurring administrative and overhead expenses at each stage of production, its financial ratios are an appropriate surrogate for Multicolor because Multicolor and its "subcontractor" together conduct the same activity as Pidilite alone.  See id. at 36-37.  Commerce reasons that if it followed Defendant-Intervenors' instructions, it would impermissibly over-count expenses for the stages of production handled by the toll manufacturer, thus weighing SG&A twice as expensive to Multicolor than to Pidilite for the same stages.  See id.  Furthermore, Commerce argues that compliance with Defendant-Intervenors' logic is also inconsistent with its longstanding practice in valuing SG&A in NME, which it followed here.  See id. at 37-38.

Goldlink also responds that Commerce correctly applied the surrogate financial ratios to calculate Multicolor's total cost of manufacturing.  See Goldlink's Resp. at 12-14.  Goldlink reasons that the factory overhead, SG&A and profit values are properly attributed to the tolling operation because Haidi's and Longteng's production costs are included in Multicolor's direct FOPs.  See id.

at 12-13. Accordingly, application of the factory overhead, SG&A and profit values to the tolling operation as well as again to Multicolor would result in double counting overhead. See id. at 13. Goldlink emphasizes that the surrogate data, here Pidilite's financial statements, reflect a fully integrated producer and is thus a reasonable comparison to Multicolor's entire production chain, including the tolling operation. See id. at 13-14. Therefore, Commerce's application of factory overhead, SG&A and profit values to Multicolor's tolling operation is supported by substantial evidence. See id. at 14.

### B.   Analysis

The Court finds that Commerce's application of financial ratios to Multicolor's tolling operation is reasonable. Commerce stated that it was not "persuaded" that "Multicolor's overhead and SG&A expenses have been understated because a portion of its production is tolled to another company." I & D Mem. at 25. Commerce applied Pidilite's financial ratios to Multicolor because Pidilite is a "fully integrated" producer of CVP-23, thus its "financial ratios serve as an appropriate surrogate for Multicolor as well as Multicolor's subcontractor." Id. Commerce concluded, that it was acting "consistent with [its] practice" and "continued to rely on the financial ratios derived from Pidilite's financial statements, without adjustment." Id. Commerce is given broad

discretion "to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko Metal, 43 F.3d at 1443. Here, Commerce determined that Multicolor and its tolling operation is comparable to Pidilite, a fully-integrated CVP-23 producer. See I & D Mem. at 25. The Court cannot say that Commerce acted arbitrarily in determining that Pidilite's financial ratios are an appropriate surrogate for Multicolor. See Hangzhou Spring Washer Co., Ltd. v. United States, 29 CIT ___, ___, 387 F. Supp. 2d 1236, 1249 (2005) (where the court similarly addressed this issue). Accordingly, Commerce's decision to apply Pidilite's financial ratios to Multicolor, as a whole, is reasonable and supported by record evidence.


## CONCLUSION

In light of the above, this case is remanded to Commerce with instructions to: (1) re-examine its selection of surrogate values for (a) benzene sulfonyl chloride, (b) calcium chloride, and (c) steam; (2) re-examine its determination to apply total adverse facts to Hanchem; (3) sufficiently explain its determination that Pidilite's financial ratios were not distorted by the subsidies received; and (4) either include terminal charges and brokerage fees in movement costs or precisely and reasonably explain its decision to not include such costs here. Where necessary, for example steam, Commerce is instructed to re-open the record and

allow the parties to submit new information.  Commerce will also make adjustments where necessary insofar as re-examination of Pidilite's financial ratios may affect other aspects of the remand determination.  Commerce is affirmed in all other aspects.


                                  /s/ Nicholas Tsoucalas
                                  NICHOLAS TSOUCALAS
                                     SENIOR JUDGE


Dated:    May 4, 2006
          New York, New York