**Slip Op. 06-142**

# UNITED STATES COURT OF INTERNATIONAL TRADE

GUANGDONG CHEMICALS
IMPORT & EXPORT CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Jane A. Restani, Chief Judge

Court No. 05-00023

## OPINION

[Results of Department of Commerce remand determination sustained.]

Dated: September 18, 2006

Garvey Schubert Barer (Ronald M. Wisla and William E. Perry) for the plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David S. Silverbrand), Arthur D. Sidney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

Restani, Chief Judge: Plaintiff Guangdong Chemicals Import and Export Corporation ("Guangdong") challenged the results of an administrative review of an antidumping duty order on sebacic acid from the People's Republic of China ("China"). Following oral argument, the court remanded for the Department of Commerce ("Commerce") to reconsider the reliability of data used to calculate the surrogate value of sebacic acid, and also to explain its choice to deduct a by-product credit from normal value, rather than from manufacturing costs. On remand,

Commerce reexamined its data, excluded aberrational values, and explained its decision to

change its policy with respect to by-product credits.  Following remand, Guangdong asserts that

Commerce's exclusion of aberrational values does not justify its use of less product-specific

data.  Guangdong also argues that Commerce's practice of deducting by-product credits from

normal value is arbitrary, capricious and unsupported by substantial evidence.  The court finds

that Commerce's choice of data set and its treatment of the by-product credit are reasonable and

supported by substantial evidence.

I.      **Background**

        In 1994, Commerce issued an order imposing antidumping duties on sebacic acid from

China.  See Sebacic Acid from the People's Republic of China, 59 Fed. Reg. 35,909 (Dep't

Commerce July 14, 1994) (notice of antidumping duty order).  On December 16, 2004,

Commerce completed an administrative review of that order for the period of review ("POR")

from July 1, 2002, to June 30, 2003.  See Sebacic Acid from the People's Republic of China, 69

Fed. Reg. 75,303 (Dep't Commerce Dec. 16, 2004) (notice of final results of antidumping

administrative review) ("Final Determination").  Two of Commerce's actions taken during that

review are at issue in this case.

        The first issue involves Commerce's valuation of sebacic acid.  Because Guangdong's

supplier of sebacic acid, Hengshui Dongfeng Chemical Co., produces a co-product, capryl

alcohol, Commerce must allocate the supplier's costs of manufacturing between the two products

based on their relative sales values.  See Section C and D Response of Guangdong Chems. Imp.

& Exp. Corp. (Nov. 4, 2003), P.R. Doc. 21, at D-4  ("Section C & D Response").  Because India

does not produce sebacic acid, Commerce relied on statistics describing the price of sebacic acid

imported into India from other countries.  Prelim. Valuation of Factors of Prod. (July 30, 2004),

P.R. Doc. 47 at 1–2.  Commerce chose to use import statistics maintained by the Indian

government, based on a six-digit Harmonized Tariff Schedule ("HTS") category ("Indian

government data").  Id., P.R. Doc. 47 at 4, Attach. 4.  That category lumped together imports of

sebacic acid with imports of azelaic acid.  Id., P.R. Doc. 47 at Attach. 4.  Guangdong advocated

the use of product-specific data maintained by the publication Chemical Weekly in its Chemicals

Import and Export trade database index ("Chemical Weekly data" or "ChemImpEx").

Submission of Publicly Available Data for Use as Surrogate Value (Sept. 8, 2004), P.R. Doc. 62

at 2 ("Surrogate Value Submission").  That data was taken from a selection of information from

the Indian government, but included a classification specific to sebacic acid.  Id., P.R. Doc. 62.

Because Guangdong's data included limited data points (in fact, only two imports, both from

Germany, totaling 1,400 kilograms), Guangdong submitted additional corroborating data to

bolster its limited data set.  Id., P.R. Doc. 62 at 2, Attach. 1.  Without considering the impact of

the corroborating data on the veracity of either data set, Commerce rejected the Chemical

Weekly data and adopted the Indian government data.  See Issues & Decision Memorandum for

the 2002-2003 Antidumping Administrative Review of Sebacic Acid from the People's Republic

of China, A-570-825, at 6–9 (Dec. 10, 2004) available at

http://ia.ita.doc.gov/frn/summary/prc/E4-3678-1.pdf ("Issues & Decision Mem.").  Because

Commerce failed to consider Guangdong's corroborating data, the court remanded this issue for

additional consideration.  Guangdong Imp. & Exp. Co. v. United States, 30 CIT __, __, 414 F.

Supp. 2d 1300, 1313 (2006).

        The second issue involves a change in Commerce's treatment of by-product credits.

Because Hengshui produces fatty acid and glycerine as by-products of sebacic acid, Commerce

gave Guangdong a credit reflecting the value of the by-products. See Final Redetermination

Pursuant to Court Remand (May 3, 2006), Remand P.R. Doc. 4 at 7 ("Final Redetermination").

In its preliminary determination, Commerce applied this credit to the cost of manufacturing

sebacic acid. See id. In its final determination, Commerce applied the credit against normal

value, after calculating overhead costs, "special general and administrative" ("SG&A")

expenses, and profits. See id. Commerce failed to provide an opportunity for interested parties

to comment on this change in methodology before issuing its final determination. Id.

Commerce therefore requested a remand in order to explain its application of the by-product

credit. Id.

Commerce issued its Final Redetermination on May 3, 2006. As described more fully

below, the Final Redetermination continued to use the Indian government data to value sebacic

acid, but adjusted the Indian government data to eliminate aberrational values. Id., Remand P.R.

Doc. 4 at 3, 5. Commerce also explained the rationale behind its application of Guangdong's by-

product credit. Id., Remand P.R. Doc. 4 at 7. Guangdong argues that Commerce's choice of

data set remains unreasonable, and that Commerce's application of the by-product credit is

unreasonable in light of generally accepted accounting procedures. See Pl.'s Comments on

Def.'s Final Determination Pursuant to Court Remand at 1–2 ("Pl.'s Comments"). The court

addresses each issue in turn.

## II.      Commerce's Use of the Indian Government Data to Calculate the Normal Value of Sebacic Acid

Because India does not produce sebacic acid, Commerce relied on import statistics to

estimate the value of sebacic acid. As mentioned, Commerce used statistics from the Indian

Department of Commerce's Import/Export Data Bank, based on a six-digit basket category in the

Indian HTS,[1] which includes both sebacic acid and azelaic acid.  Issues & Decision Mem. at 3.

During the review, Guangdong offered more product-specific data compiled in an import and

export database maintained on the website of the Indian publication Chemical Weekly.

Guangdong Chems. Imp. & Exp. Co. Case Br. (Sept. 20, 2004), P.R. Doc. 65, at 4–6.

Guangdong proposed using the Chemical Weekly data, which was based on a portion of the

Indian government's information, but was further subdivided and included a specific subheading

for sebacic acid.[2]  Surrogate Value Submission, P.R. Doc. 62 at 2.  Based on this data,

Guangdong argued that the value of sebacic acid in India during the POR was $3,551.73.[3]  Id.,

P.R. Doc. 62 at 2.  Guangdong corroborated its proposed value with data from U.S. import

statistics for sebacic acid, benchmark price data from the publication Chemical Market Reporter,

and prices for oxalic acid, a chemical asserted to be similar to sebacic acid.  Id., P.R. Doc. 62 at

2–3.

In response to Guangdong's proposed data, Commerce conducted additional research to

determine whether prices of azelaic and sebacic acid were similar.  See Comparison of U.S. Int'l

Trade Comm'n Dataweb Values for Sebacic Acid & Azelaic Acid Imps. to the United States

(Dec. 10, 2004), P.R. Doc. 79 at 1 ("Price Comparison Mem.").  It concluded that the two

products were similarly priced, varying only by $.30 per kilogram over a twenty-three-month

period during which the price for sebacic acid ranged between $2 and $3 per kilogram.  Id., P.R.

---

[1]  The six-digit Indian HTS heading is 291713.

[2]  The eight-digit heading for sebacic acid is 291713.02.

[3]  All prices are in U.S. dollars per metric ton unless otherwise stated.

Doc. 79 at 1.  Commerce therefore used the broader Indian government data to arrive at a

surrogate value of $15,826.30 for sebacic acid.  See Issues & Decision Mem. at 9 (electing to use

Indian government data); see also Prelim. Valuation of Factors of Prod., P.R. Doc. 47 at 4 (using

Indian government data to arrive at $15,826.30 per-metric-ton value for sebacic acid).  In

rejecting the Chemical Weekly data, Commerce reasoned that it could not determine how the

Chemical Weekly data were derived from the Indian government information, and that the

Chemical Weekly data lacked "a sufficiently broad range of import values."  See Issues &

Decision Mem. at 7.

Guangdong filed suit in this Court to challenge the results of the administrative review.

See Guangdong, 30 CIT at __, 414 F. Supp. 2d at 1300.  Guangdong argued, inter alia, that

Commerce had not supported its decision to use the Indian government data instead of the

Chemical Weekly data.  Id. at __, 414 F. Supp. 2d at 1303.  Because Commerce did not explain

why it rejected the Chemical Weekly data without consideration of the corroborating data

submitted by Guangdong, nor explained why the Indian government data were not aberrational,

the court remanded for Commerce to address these infirmities in its reasoning.  Id. at __, 414 F.

Supp. 2d at 1312–13.

In its Final Redetermination, Commerce retained use of the Indian government data, but

"examined the U.S. import statistics, the European Union import statistics, and the Chemical

Market Reporter data that Guangdong provided on the record for benchmarking purposes."

Final Redetermination, Remand P.R. Doc. 4 at 5.  Commerce noted that the value of sebacic acid

in the Final Determination, $15,826.30, was significantly higher than the value of the

"benchmark data," which showed a price of $3,061.54 for sebacic acid imported into the United

States (excluding China, India and Korea), $3,098.42 for the European Union, and $4,187.60

developed from price quotes in the Chemical Market Reporter.  Final Redetermination, Remand

P.R. Doc. 4 at 5.  On the basis of this evidence, Commerce found that its data for the POR were

aberrationally high when compared with Guangdong's corroborating data.  Id., Remand P.R.

Doc. 4.  Consequently, Commerce reexamined its import data for India and determined that sales

from the United States had skewed its results.  Id., Remand P.R. Doc. 4 at 5–6.  After removing

the aberrational data, Commerce found the Indian import price of sebacic acid to be $4,901.88.

Id., Remand P.R. Doc. 4  at 6.  Despite these changes, Guangdong continues to argue that

Commerce could not reasonably use the Indian government data when a more product-specific

data set was on the record.

      19 U.S.C. § 1677b (2000) provides that valuation of factors of production "shall be based

on the best available information," but does not mandate that Commerce use any particular data

source.  Id. § 1677b(c)(1)(B).  This gap in statutory authority leaves Commerce with

considerable discretion in selecting a data source to calculate normal value.  See Nation Ford

Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).  The court will uphold

Commerce's determination unless it is unsupported by substantial evidence on the record or

otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The fact that the evidence

on the record may support two inconsistent outcomes does not mean that the agency's selection

of one alternative is unreasonable.  Goldlink Indus. Co. v. United States, 30 CIT __, __, 431 F.

Supp. 2d 1323, 1326 (2006) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

Thus, "the court may not substitute its judgment for that of the [agency] when the choice is

'between two fairly conflicting views, even though the court would justifiably have made a

different choice had the matter been before it de novo.' " Id. at __, 431 F. Supp. 2d at 1326

(quoting Am. Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276

(1984)).

In this case, Commerce identified "several factors, including the quality, specificity, and

contemporaneity of the source information."[4] Final Redetermination, Remand P.R. Doc. 4 at 2.

Commerce must "conduct a fair comparison of the data sets on the record" with regard to these

factors. Allied Pac. Food (Dalian) Co. v. United States, 30 CIT __, __, 435 F. Supp. 2d 1295,

1313–14 (2006) (emphasis added). That is, Commerce's analysis must do more than simply

identify flaws in the data sets it rejects. Commerce must also apply the same criteria to the data

upon which it relies, and explain how the preferred data meet these criteria, or why a given

criterion should not apply to the preferred data. The fact that a rejected data set is superior with

respect to one criterion is not determinative so long as Commerce explains why the preferred

data set is superior overall, and what steps were taken to ameliorate weaknesses in the preferred

data.

This case involves two proposed data sets, the Chemical Weekly data and the Indian

government data. The court's remand focused on Commerce's treatment of two criteria with

respect to these data sets. First, the court remanded for Commerce to consider the "quality" of

the Indian government data, i.e., its reliability in light of the evidence on the record. Guangdong,

---

[4] In its preliminary determination, Commerce stated that it will select, "where possible, the publicly available value which was (1) [a]n average non-export value; (2) representative of a range of prices within the POR or most contemporaneous with the POR; (3) product-specific; and (4) tax exclusive." Sebacic Acid from the People's Republic of China, 69 Fed. Reg. 47,409, 47,411 (Dep't Commerce Aug. 5, 2004) (preliminary results of antidumping duty administrative review and notice of partial rescission).

30 CIT at __, 414 F. Supp. 2d at 1313 ("Having failed to consider whether the $15,826.30 figure derived from the basket category was aberrational despite evidence of its wide variation from the value of the same basket category in another year, Commerce failed to present substantial evidence supporting its surrogate value for sebacic acid.").  Second, the court remanded for Commerce to explain its choice not to use the more product-specific Chemical Weekly data set, in spite of Guangdong's corroborating data.  Id. at __, 414 F. Supp. 2d at 1312 (remanding for Commerce to reconsider its "depart[ure] from its generally expressed preference for product-specific data" based on Guangdong's submission of corroborating evidence).

A.      **Commerce's Comparison of the Data Sets on the Record Was Reasonable**

On remand, Commerce considered Guangdong's corroborating evidence and its implications for the "quality" of the Indian government data, which it had previously ignored. See Final Redetermination, Remand P.R. Doc. 4 at 5 ("In our Final Results, we did not address these data points that Guangdong provided for benchmarking purposes.").  Commerce determined that Guangdong's corroborating evidence raised questions regarding the quality of the Indian government data.  Id., Remand P.R. Doc. 4 at 5 ("[W]e find that the period of review . . . average sebacic acid surrogate value from the Indian six-digit HTS category . . . is significantly higher than the average import value from the previous POR . . . and higher than the data provided by Guangdong from the European Union import statistics, the U.S. import statistics, and the Chemical Market Reporter.").  Commerce chose to address this problem by excluding aberrational values.[5]  Id., Remand P.R. Doc. 4 at 5–6.  The elimination of aberrational

_____

[5]  Specifically, Commerce excluded imports from the United States, the price of which was ten-times greater than the price of imports from other countries during the POR.  Final Redetermination at 5.

values has been held to be a reasonable means for compensating for flaws in a data set.  See

Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, Slip-Op. No. 04-88, 2004 WL

1615597, at *12 (CIT July 19, 2004) (ordering exclusion of aberrational values from one country

to avoid distortions in the overall value for a specific import category); Issues & Decision

Memorandum for Final Determination in Steel Wire Rope from the People's Republic of China,

A-570-859 (Feb. 14, 2001), available at  http://ia.ita.doc.gov/frn/summary/prc/01-4895-1.txt

(stating that Commerce "has excluded – where appropriate – aberrational data that appear to

distort the overall value for a specific import category").  The court finds that Commerce's

elimination of aberrational values constituted a reasonable step to compensate for some

weaknesses in the Indian government data based on the evidence in the record.

Having adjusted the Indian government data, Commerce then performed a comparison of

the Indian government data with the Chemical Weekly data offered by Guangdong.  Commerce

acknowledged that "it may appear that the eight-digit category developed by ChemImpEx is

more specific than the six-digit [HTS] category," Final Redetermination, Remand P.R. Doc. 4 at

4, and also that the price of azelaic acid was, on average, about 18.75% higher than the price for

sebacic acid during the POR.  Id. at 6.  Despite these relative strengths of the Chemical Weekly

data, Commerce found that, on balance, the Indian government data were the best available

information on the record.  Commerce also found that Guangdong's corroborating information

"d[id] not remedy the deficiencies in quality or the limited number of data points in the

[Chemical Weekly] data provided by Guangdong for sebacic acid."  Final Redetermination,

Remand P.R. Doc. 4 at 5.

Commerce rejected the Chemical Weekly data primarily for two reasons.  First,

Commerce found that it was unclear how the data reported in <u>Chemical Weekly</u>'s ChemImpEx

database were selected.  Although the parties appear to agree that the <u>Chemical Weekly</u> data

were developed using information obtained from the Indian government, the <u>Chemical Weekly</u>

data did not use all of the available data.  <u>See</u> Pl.'s R. 56.2 Mot. J. Agency Record 16 (stating

that the <u>Chemical Weekly</u> data were "derived from ship manifest data collected by Indian

Customs authorities"); <u>Final Redetermination</u>, Remand P.R. Doc. 4 at 4 (stating that the

<u>Chemical Weekly</u> data were "derived from the Daily Lists published by the customs authorities

in India," and noting that "ChemImpEx does not provide the methodology on how the data was

selected or from where the data [were] derived").  Only about half of the sebacic and azelaic acid

imported into India is represented in the statistics from <u>Chemical Weekly</u>'s database.  <u>Final</u>

<u>Redetermination</u>, Remand P.R. Doc. 4 at 4.  Commerce found no information on the record

showing why certain imports were included, while other imports were not.  Consequently,

Commerce could not be sure that the data were "truly representative of the full data set from

which [they were] derived."  <u>Id.</u>, Remand P.R. Doc. 4 at 4.  A lack of information regarding the

selection of data in a data set raises concerns distinct from concerns raised by the size of that

data set.  Without information on how transactions were chosen for inclusion in the <u>Chemical</u>

<u>Weekly</u> data, Commerce could not be certain that the method used to select imports in the

<u>Chemical Weekly</u> data was not biased.

    Second, Commerce noted that the <u>Chemical Weekly</u> data included only two data points,

consisting of two sales from the same company in Germany to India.  <u>Id.</u>, Remand P.R. Doc. 4 at

4.  By contrast, the Indian government data, even after removing aberrational values, represented

imports from five different countries.  <u>Id.</u>, Remand P.R. Doc. 4 at 6.  The use of broader product

categories is reasonable, despite the availability of product-specific data, if a greater variety of data provides greater reliability.  See Writing Instrument Mfrs. Ass'n v. U.S. Dep't Commerce, 21 CIT 1185, 1195–96, 984 F. Supp. 629, 639–40 (1997) (approving use of basket category of import statistics from Pakistan, rather than more product-specific data from India, where Commerce found substantial evidence on the record suggesting that the Indian data were "aberrational and unreliable").  The court therefore finds that Commerce's decision to use the Indian government data is supported by substantial evidence.[6]

## B.    Guangdong's Additional Arguments

Guangdong claims that Commerce's decision merely to adjust the Indian government data cannot be reasonable in view of the evidence Guangdong submitted showing prices of $32,045.58 for azelaic acid and $3,551.73 for sebacic acid.  Pl.'s Comments at 4; see also Pl.'s R. 56.2 Mot. J. Agency Record at Attach. 1 (submitting data for azelaic acid).  Guangdong argues that the presence of azelaic acid in the Indian government data must have skewed the price for sebacic acid upwards because the price of azelaic acid was almost ten-times that of sebacic acid.  Pl.'s Comments at 4.

This argument assumes that the price of azelaic acid shown in the Chemical Weekly data is reliable.  Commerce has explained that the prices in the Chemical Weekly data are unreliable because they do not account for all imports of sebacic acid or azelaic acid into India, and it is unclear how the selected data were chosen.  Final Redetermination, Remand P.R. Doc. 4 at 4 ("Although the data [in Chemical Weekly's Chemicals import/export database] was originally

_____

[6] Because the court finds that these reasons are sufficient to justify Commerce's choice of data sets, the court does not address Commerce's arguments concerning imports from Malaysia and the purity of sebacic acid imports in the Chemical Weekly data.

derived from the Daily Lists published by the customs authorities in India, using a classification system that has been developed by Chemical Weekly, [it] does not provide the methodology on how the data was selected or from where the data was derived."). Morever, the evidence on the record supporting Guangdong's asserted price for azelaic acid is weaker than the evidence supporting Guangdong's asserted price for sebacic acid. Guangdong has not presented any evidence corroborating the Chemical Weekly data's price for azelaic acid. Evidence submitted by Guangdong shows that the price of azelaic acid exported to India from the United States was between four and eight times greater than the price of other azelaic acid imported by India in the same period. See Pl.'s R. 56.2 Mot. J. Agency Record at Attach. 1 (showing U.S. export price of 2855 rupees per kilogram of azelaic acid, as compared to 316 rupees per kilogram from Malaysia and 636 rupees per kilogram from Japan). In fact, as Guangdong points out, other evidence in the record shows that prices for azelaic acid in the United States were substantially lower than the $32,045.58 found in the Chemical Weekly data. Pl.'s Comments at 6 ("Commerce's own analysis shows that U.S. prices for both azelaic acid and sebacic acid are priced BELOW $3,000 per metric ton."). Finally, Commerce conducted its own analysis of the prices of azelaic acid and sebacic acid, and found a much smaller variation. See Final Redetermination, Remand P.R. Doc. 4 at 6, Attach. 1 (finding that the U.S. prices of sebacic acid were on average only 18.75 percent lower than those of azelaic acid during the POR). Commerce was therefore justified in concluding that inclusion of azelaic acid in the Indian government data did not skew the surrogate value of sebacic acid as much as Guangdong claims.

In a similar argument, Guangdong attacks Commerce's comparison of U.S. prices of azelaic and sebacic acid to establish the average variance in price between the two products.

Pl.'s Comments at 5–6.  Guangdong argues that Commerce has not adequately explained why it did not rely on the Indian prices from Chemical Weekly for the purpose of comparing the respective prices of sebacic and azelaic acid instead.  Id.  The impact of this argument is blunted by the absence of evidence corroborating the price of azelaic acid found in the Chemical Weekly data.  Given the absence of evidence corroborating Guangdong's price, and the aberrationally high price of azelaic acid exported from the United States, it was reasonable for Commerce to conclude that U.S. domestic price data were the more appropriate benchmark for comparison. See Timken Co. v. United States, 26 CIT 434, 446–47, 201 F. Supp. 2d 1316, 1328 (2002) (stating that use of U.S. data as a benchmark to "determine the reliability of . . . surrogate data is within 'Commerce's statutory authority and consistent with past practice.'" (quoting Peer Bearing Co. v. United States, 22 CIT 472, 481, 12 F. Supp. 2d 445, 455 (1998))).

Finally, Guangdong argues that Commerce's surrogate value of sebacic acid cannot be reasonable because it exceeds the prices reflected in Guangdong's corroborating data.  Pl.'s Comments at 5.  The mere fact that Commerce's surrogate value is higher than one or all of Guangdong's benchmarks does not mean that that value is unreasonable per se.  Guangdong notes that Commerce's surrogate value is 60 percent higher than U.S. imports of sebacic acid, 58 percent higher than European Union imports of sebacic acid, 17 percent higher than price in the Chemical Market Reporter data, and 38 percent higher than Guangdong's proposed surrogate value.  Id.  Still, Guangdong's own corroborating evidence exhibits similar levels of variation. For example, the value found in the Chemical Market Reporter data ($4,187.60) is 36.7 percent greater than the value established by the U.S. import prices, and 35.1 percent greater than the value of the imports into the European Union.  See id,  Moreover, Commerce's price is lower

than the surrogate values for sebacic acid found in other administrative proceedings.  See Issues

& Decision Memorandum for Final Results of Changed Circumstances Review in Sebacic Acid

from the People's Republic of China, A-570-825, at 17 (Mar. 23, 2005), available at

http://ia.ita.doc.gov/frn/summary/prc/E5-1401-1.pdf (finding surrogate value of sebacic acid to

be $5,459.72 during the POR of July 1, 2002, to June 30, 2003, and noting a surrogate value of

$5,388.66 for the administrative review conducted between July 1, 2000 and June 30, 2001, after

adjusting for inflation).  Given the variation among the corroborating data, the court finds that

Commerce's surrogate value is not unreasonably high.

The court therefore affirms as reasonable Commerce's analysis of the reliability of the

Indian government data in view of the corroborating evidence submitted by Guangdong.

### III.     Commerce's Application of the By-Product Credit to Normal Value

The remaining issue in this case arises from Commerce's treatment of by-product

revenue from sales of fatty acid and glycerine made in the process of manufacturing sebacic

acid.  Congress has mandated that, in cases involving imports from non-market economies,

Commerce must calculate the normal value of a respondent's factors of production using a

surrogate data source from a country of similar size and economic development.  19 U.S.C.

§ 1677b(c)(4).  The law requires Commerce to calculate normal value based on a number of

factors of production, including labor, raw materials, energy used, and the cost of capital.  Id.

§ 1677b(c)(3).  After determining the costs of these materials, Commerce must also add "an

amount for general expenses and profit plus . . . other expenses."  Id. § 1677b(c)(1).  These

general expenses are calculated using "financial ratios" based on a surrogate's overhead costs,

SG&A, and profits.  See Goldlink Indus. ,  30 CIT at __, 431 F. Supp. 2d at 1333.  In this case,

Commerce derived these ratios using data from the Reserve Bank of India Bulletin.  See Prelim.

Valuation of Factors of Prod., P.R. Doc. 47 at 8.  Commerce calculated the "overhead ratio" by

dividing total factory overhead by the cost of "direct items" (including, inter alia, raw materials,

power and labor).  See id. at Attach. 8.  For SG&A, Commerce divided total SG&A expenses by

the sum of direct items and factory overhead.  See id., P.R. Doc. 47 at 8.  Finally, to generate the

profit ratio, Commerce divided the amount of pre-tax profits by the sum of direct items, factory

overhead and SG&A.  See id., P.R. Doc. 47 at 8.  These ratios were then applied to the

respondent's surrogate values to determine the amount of overhead, SG&A and profits.  See

generally Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT __, __, 366 F.

Supp. 2d 1264, 1277 n.7 (2005) (describing calculation of financial ratios).

        19 U.S.C. § 1677b(c) does not mention the treatment of by-products, nonetheless,

Commerce sometimes grants a respondent a "credit" for a "by-product . . . generated in the

manufacturing process [that is] either reintroduced into production or sold for revenue."  Final

Redetermination, Remand P.R. Doc. 4 at 7.  Both by-products in this case are sold for revenue.

Id., Remand P.R. Doc. 4 at 12.  In its preliminary results, Commerce deducted by-product

revenues from manufacturing costs, before applying the financial ratios.  Id., Remand P.R. Doc.

4 at 7.  In its final results, however, Commerce determined that the by-product credit should

have been deducted from normal value, after calculation of overhead, SG&A and profit amounts

based on the cost of manufacturing.  Id., Remand P.R. Doc. 4 at 7.

        In the past, Commerce's practice was to apply by-product credits against the

manufacturing costs of the respondent, prior to the calculation of overhead, SG&A and profits.

See id., Remand P.R. Doc. 4 at 7; see also Union Camp Corp. v. United States, 22 CIT 267, 270,

8 F. Supp. 2d 842, 846 (1998) (noting that in its 1996 antidumping administrative review of

sebacic acid from China, Commerce subtracted by-product sales revenues from the

manufacturing cost of sebacic acid).  Because overhead, SG&A and profits are calculated based

on manufacturing costs, a reduction in manufacturing costs reduces overhead, SG&A and profit

amounts as well.  Commerce recently adopted a new policy with respect to by-product credits.

Final Redetermination, Remand P.R. Doc. 4 at 7–8.  Commerce now looks to the financial

statement of the company (or companies) used to calculate surrogate value and applies the by-

product credit in the same manner as the surrogate does.  Id., Remand P.R. Doc. 4 at 7–8.  In the

event that the surrogate financial statement does not state how by-product revenue is applied,

Commerce will "consider other information on the record, such as whether the by-product was

re-introduced into the production process or sold for revenue purposes."  Id., Remand P.R. Doc.

4 at 8.  In this case, Commerce found that deducting the by-product credit from normal value,

after applying the financial ratios, was "appropriate . . . because it is reflective of the

respondent's practice to sell the by-product as opposed to reintroducing it into the production

process."  Id., Remand P.R. Doc. 4 at 8.  This methodology does not reduce manufacturing costs

prior to the calculation of overhead, SG&A and profit amounts, which in turn results in a higher

normal value and dumping margin.[7]  Guangdong argues that "[t]here is no rational basis for

---

[7] For example, assume that a respondent has manufacturing costs of $1000, financial ratios of 20%, and receives a by-product credit of $100.

Using Commerce's old methodology, that company would have a normal value of $1080. ($1000 - $100 = $900;  $900 + ($900 × .2) = $1080).  Using Commerce's new methodology, and assuming the by-product was sold, that company would have a normal value of $1100.  ($1000 + ($1000 × .2) = $1200; $1200 - $100 = $1100).  The dispute in this case does not involve the size of the by-product credit itself, but whether a respondent should receive the added benefit ($20 in

Commerce's departure from its longstanding administrative practice of applying the by-product offset as an adjustment to production costs." Pl.'s Comments 11.

Commerce claims that this methodology was approved as reasonable in Sinopec Sichuan Vinylon Works v. United States, 29 CIT __, __, 366 F. Supp. 2d 1339, 1351 (2005). Sinopec involved a respondent, Sinopec Sichuan Vinylon Works ("SVW") that produced polyvinyl alcohol ("PVA") in China. Id. at __, 366 F. Supp. 2d at 1340. Commerce chose a company in India, Jubilant, which produced a precursor to PVA, polyvinyl acetate ("PVAc"), to act as a surrogate. Id. at __, 366 F. Supp. 2d at 1340–41. SVW produced a by-product, acetic acid, when it converted PVAc into PVA. Id. at __, 366 F. Supp. 2d at 1341. SVW "recover[ed] and reuse[d]" this by-product in its production process. Id. at __, 366 F. Supp. 2d at 1351. Because Jubilant did not produce PVA, it did not produce acetic acid as a by-product of converting PVAc into PVA.[8] Id. Commerce determined that SVW should receive a by-product credit for producing acetic acid, but because Jubilant did not produce acetic acid as a by-product of converting PVAc to PVA, Commerce determined that it should not apply the by-product credit before applying Jubilant's financial ratios to the cost of manufacture. Id. at __, 366 F. Supp. 2d at 1349–50. Commerce's practice was not intended to account for additional costs associated with the production of acetic acid, however, but to ensure that deduction of the by-product credit did not artificially distort the overhead, SG&A and profit expenses associated with the production of PVAc. Sinopec, 29 CIT at __, 366 F. Supp. 2d at 1348 (stating that Commerce's

the example above) associated with reduced overhead, SG&A and profit amounts.

[8] Jubilant produced acetic acid as a by-product, but not at the relevant stage of production. Id. at __, 366 F. Supp. 2d at 1351.

determination to apply the by-product credit after the financial ratios was intended "to equate the base on which the ratios were calculated with the base to which they were applied").

Commerce's reasoning in Sinopec was entirely different from its reasoning in the Final Redetermination. In this case, Commerce never suggested that the application of financial ratios to cost of manufacturing data before deduction by-product revenues would mischaracterize Hengshui's cost of manufacturing sebacic acid. Rather, Commerce applied the by-product credit after the financial ratios to reflect the fact that, where a by-product is sold, "the by-product necessarily incurs expenses for overhead, SG&A, and profit." Final Redetermination, Remand P.R. Doc. 4 at 12. Thus, the reasoning behind Sinopec does not support Commerce's determination in this case.

Turning to Commerce's explanation in the Final Redetermination, the court finds that the remainder of Commerce's analysis provides a reasonable basis for its decision to apply by-product credits after a surrogate's financial ratios where the by-product is sold. Hengshui sells two by-products, revenue from which may be used to offset the cost of producing sebacic acid. Where a by-product is sold, Commerce assumes that the respondent would incur overhead, SG&A and profit expenses in selling the by-product. Final Redetermination, Remand P.R. Doc. 4 at 12. The Reserve Bank of India statistics, from which Commerce derived its surrogate financial ratios, include "selling commission[s]," "bad debts," and advertising as sales expenses. See Prelim. Valuation of Factors of Prod. Mem., P.R. Doc. 47 at Attach. 8. A respondent's sales of a by-product would appear to incur each of these costs over and above what a surrogate spends to sell its primary products. If the surrogate does not produce a similar by-product, it would be reasonable for Commerce to conclude that the surrogate would not incur these

expenses.  Therefore, it is reasonable for Commerce to adjust a by-product credit to reflect the additional sales expenses incurred by the respondent.

Guangdong argues that Commerce could not reasonably have chosen to account for separable costs associated with the sale of a by-product by changing the point at which it applies the by-product credit.  Guangdong notes that, as a matter of accounting procedure, by-products are commonly subtracted from the cost of manufacturing a main product.  See Pl.'s Comments at 11 ("[G]enerally accepted accounting principles . . . normally treat both by-product income and by-products consumed in the production process as offsets to manufacturing costs.") (emphasis removed); see also Charles T. Horngren & George Foster, Cost Accounting: A Managerial Emphasis 490 (6th ed. 1987) ("The estimated net realizable values of [by-products and scrap] are best treated as deductions from the cost of the main products.") (emphasis removed).  Nevertheless, it appears that "[c]onsiderable variation exists in accounting for by-products."  Wayne J. Morse & Harold P. Roth, Cost Accounting 157 (3d ed. 1986).  Indeed, in some circumstances, by-product sales may be credited to miscellaneous income.  Id. at 158.

The court's opinion in Magnesium Corp. of America v. United States, 20 CIT 1092, 1107–08, 938 F. Supp. 885, 900 (1996), supports Commerce's treatment of the by-product credit.  In that case, in its preliminary determination, Commerce subtracted a by-product credit from the respondent's cost of materials, before calculating the cost of manufacturing.[9]  Id. at 1106, 938 F. Supp. at 899.  In its final determination, Commerce changed its practice and applied the by-product credit after calculating the cost of manufacturing, thus increasing the amount of

_____

[9]  Cost of manufacturing is composed of the cost of materials plus factory overhead, which is calculated by multiplying cost of materials by a factory overhead ratio.  See Magnesium Corp., 20 CIT at 1106, 938 F. Supp. at 899.

factory overhead.  Id.  Commerce did this to reflect "the by-product processing costs, thereby eliminating the need for valuing any additional processing-related elements."  Id. (quotations omitted).  Plaintiff argued that separable by-product processing costs should have been deducted from by-product revenues, and that the by-product revenue should have been deducted before calculating manufacturing cost.  Id.  The court disagreed, finding that Commerce's decision to change the timing of the application of the by-product credit was a reasonable means of "account[ing] for . . . costs related to by-product processing" while avoiding "costly accounting procedures" not warranted for by-products.  Id. at 1107, 938 F. Supp. at 900.  Similarly, Guangdong's argument implies that Commerce should have calculated a separate overhead, SG&A and profit amount for Hengshui's by-products, deducted that amount from the by-product credit, and then deducted the remaining by-product credit from manufacturing costs.  This would require Commerce to engage in just the "costly accounting procedures" that the court in Magnesium Corp. found to be unnecessary.  As in Magnesium Corp., Commerce's decision to change when it applies the by-product credit is a reasonable alternative means of accounting for additional overhead, SG&A and profit expenses associated with Hengshui's sale of by-products. Even if Guangdong's alternative approach to implementation of the statute were reasonable, the court could not substitute its own view of the statute for Commerce's reasonable interpretation or implementation.  Id. (citing Chevron, U.S.A. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)).

Therefore, the court upholds Commerce's decision to account for separable costs associated with by-product sales by applying a by-product credit after application of financial ratios to manufacturing costs.

**IV.     Conclusion**

The results of the remand determination are sustained in their entirety.


                                                                          /s/ Jane A. Restani
                                                                Jane A. Restani
                                                                Chief Judge


Dated:  This 18th day of September, 2006.
        New York, New York